### STATE v. TABER LUMBER COMPANY.[1]

May 31, 1907.

Nos. 15,259—(19).

**Taxation—Logs—Interstate Commerce.**

　　Logs which are cut, banked, and boomed upon the ice of a lake, with the intention of exporting them from the state, do not become articles of interstate commerce in transit until delivered to a common carrier for such purpose of exportation. Such logs, although destined for exportation, do not cease to be part of the general mass of property in the state while any

[1]Reported in 112 N. W. 214.

substantial part of the work of delivery to the common carrier remains to be done.

**Same—Delivery to Carrier.**

In this case the owner of standing timber entered into a contract with a lumber company to cut and convert the same into logs, and to deliver them to the owner at a point within the state beyond the initial carrier. *Held*, the lumber company was the constituted agent of the owner for the purpose of delivering the logs to the carrier, and the work of towing the logs in the lakes to the booms, where they were hoisted from the water onto cars for shipment, was a part of the process of delivery. It is immaterial that the lakes, upon the ice of which the logs were banked and boomed, were navigable waters; the owner, through its agent, having adopted that method as a means of conveying them to the hoists.

**Evidence.**

It was conclusively established by the evidence that the logs in question were not delivered to the initial carrier for exportation until after May 1, 1905, and hence were subject to taxation for that year.

Proceeding in the district court for Itasca county to recover $1,015.-29 for personal property taxes delinquent for the year 1906. The case was tried before McClenahan, J., who found in favor of plaintiff for the sum demanded. From a judgment entered pursuant to the findings, defendant appealed. Affirmed.

*C. C. McCarthy*, for appellant.

*Edward T. Young*, Attorney General, and *Alfred L. Thwing*, County Attorney, for the State.

LEWIS, J.

This case involves the validity of a tax levied by Itasca county upon 10,771,610 feet of logs, property of appellant, claimed by the state to be within the county and taxable on the 1st day of May, 1905. Appellant is a corporation organized under the laws of the state of Iowa, engaged in the manufacture and sale of lumber and lumber products at Keokuk, Iowa, and has obtained the logs for its mills from the state of Minnesota. Appellant owned considerable standing timber in the vicinity of certain lakes in Itasca county, and had a continuing contract with the Itasca Lumber Company, a Minnesota corporation, to cut, log, and transport the same from such lakes over a railroad to the Mississippi river, and thence down the river as far as Pokegama dam, near the city of Grand Rapids.

These facts are undisputed: During the winter of 1904–05, pursuant to its contract with appellant, the Itasca Lumber Company cut 10,771,-610 feet of the standing timber, converted it into saw logs, and hauled and piled them upon the ice in certain lakes in Itasca county, viz.: Turtle Lake, 1,760,280 feet; Hatch's Lake, 3,960,570 feet; Jessie Lake, 914,670 feet; and Spring Lake, 4,136,090 feet. These logs were placed in the lakes on or before April 1, 1905, and booms were stretched about them and fastened to the shore to protect them from becoming scattered after the ice melted.

As found by the court: The Minneapolis & Rainy River Railroad Company is a corporation existing under and by virtue of the laws of the state of Minnesota, was incorporated in the summer of 1904, and thereafter maintained and operated a certain railroad line, which furnished a connection by rail between Little Turtle Lake, Big Turtle Lake, Jessie Lake, and Spring Lake respectively, and the Mississippi river at a point near Deer river, and during all such time has maintained hoists on Jessie, Spring, and Big Turtle Lakes, used for loading logs from the waters of the lakes onto the cars used in the operation of such railroad. The court further found that all those lakes and the Mississippi river were navigable waters, and that the logs in question, when so landed on the ice, were boomed preparatory to driving them to the hoists, where they could be loaded on the cars of such railroad and thence transported to the Mississippi river; that May 1, 1905, the logs in Jessie and Spring Lakes had not been disturbed; that Hatch's Lake, the most northerly of the number, is connected by a channel with Big Turtle Lake, and that prior to May 1, 1905, the logs landed on the ice in that lake were sluiced through the channel preliminary to being delivered at the hoists maintained on Big Turtle Lake; that subsequent to May 1, 1905, all the other logs in the other lakes mentioned were taken from the respective places where they had been boomed and moved to the hoists maintained by the railroad company on the shores of the respective lakes, loaded, and transported to the Mississippi river, and thereafter, in due course of time, delivered to the mills at Keokuk. The court further found that the logs were subject to taxation on the first of May, for the reason that they had not yet entered upon their journey out of the state and had not become the subject of interstate commerce.

As we understand appellant's position, it is that, immediately the logs were banked upon the ice of the several lakes and the booms thrown about them, preparatory to their being carried to the respective hoists for delivery upon cars of the railroad for transportation over the usual route to Keokuk, delivery for the purpose of exportation was complete; in other words, the banking and booming of the logs in the manner stated was equivalent to depositing them in the depot, or entrepot, of the common carrier; further, that the Itasca Lumber Company was the constituted agent of appellant merely for the purpose of preparing the logs for shipment, and that the duty of the company in that respect ceased upon placing the logs on the ice. It is further claimed that the Itasca Lumber Company, in taking possession of the logs at the booms, towing them to the hoists, causing them to be conveyed by railroad to the Mississippi river, driving them down the river, and delivering them to appellant below Pokegama dam, was engaged in the business of transporting the logs on their journey out of the state.

Appellant relies on Coe v. Errol, 116 U. S. 517, 6 Sup. Ct. 475, 29 L. Ed. 715. In that case certain logs had been cut during the previous winter and piled in and upon the banks of a stream in the town of Errol, Coos county, New Hampshire, to be thence floated down the Androscoggin river to the state of Maine, where they were to be manufactured and sold. The selectmen of the town assessed the logs upon the first of April, before they had been moved. The court laid down certain propositions of law, to wit: That the carrying of property in carts or vehicles, or floating it, to the depot where the journey is to commence, is no part of the exportation; that the exportation has not begun until the goods are committed to the common carrier for transportation out of the state to the state of their destination, or until they have started on their ultimate passage to that state. Among other things the court said: "Such goods do not cease to be part of the general mass of property in the state, subject, as such, to its jurisdiction and to taxation in the usual way, until they have been shipped or entered with a common carrier for transportation to another state, or have been started upon such transportation in a continuous route or journey. * * * Whenever a commodity has begun to move as an article of trade from one state to another, commerce in that commodity between the states has commenced. But this move-

ment does not begin until the articles have been shipped or started for transportation from the one state to the other. The carrying of them in carts or other vehicles, or even floating them, to the depot where the journey is to commence, is no part of that journey. That is all preliminary work, performed for the purpose of putting the property in a state of preparation and readiness for transportation. Until actually launched on its way to another state, or committed to a common carrier for transportation to such state, its destination is not fixed and certain."

This is a leading case on the subject and has been cited in many jurisdictions, and we consider the principles there announced as controlling in the case under consideration. If the logs in question were finally delivered by appellant company to the common carrier when banked and boomed on the ice, then they became the subject of interstate commerce on or before April 1; but, if the process of towing the logs. through the several lakes to the hoists was simply a part of the work of delivery to the common carrier, then the case is similar to Coe v. Errol, supra, and on the first of May the logs had not ceased to be a part of the general mass of property of the state. The fact that there was a continuing agreement between appellant and the Itasca Lumber Company for the annual cutting of pine timber upon appellant's lands, making the same into logs, and transporting them through the lakes over the railroad to the Mississippi river, and down the river to Pokegama dam, does not, in itself, stamp the work of moving the logs, after being banked and boomed on the ice, as interstate commerce.

It is not decisive of this question that some of the agents and employees of the Itasca Lumber Company were engaged in handling the logs at the hoists and placing them on the cars, and thereafter delivering them into the Mississippi river and driving them down that stream. The fact that the several lakes were navigable does not, in itself, prove that the logs were delivered at the entrepot of a common carrier when placed on the ice and boomed. The question does not turn upon the length of time which existed between the banking and booming of the logs on the ice and their transportation to the hoists; nor is it a controlling factor that it was the purpose and intent of appellant company from the beginning that all of the logs cut pursuant to the contract with the Itasca Lumber Company should be transported in the usual and

ordinary way to its mills at Keokuk, and that in fact such result was finally accomplished during the season of 1905.

The proviso in section 822, R. L. 1905, reads: " * * * Provided, that logs and timber cut from lands within, and designed to be transported out of, this state shall be assessed and taxed in the taxing district where found on May 1." The plain intent of the legislature, as expressed by this language, was that logs should not be exempt from taxation merely because they were cut with the design of exporting them out of the state. So the purpose and intent with which the logs were placed on the ice is not important, and the question narrows down to whether or not on May 1, the logs had been delivered for exportation. In our judgment, it conclusively appears from the evidence that on that date all of the property was still under the dominion and control of appellant through its agent, the Itasca Lumber Company, and that a material part of the work of delivery for exportation was still to be done. This conclusion is justified by two facts, which are undisputed: First, that all of the work with reference to the cutting, banking, towing, and booming of the logs at the hoists was done by the Itasca Lumber Company, as the agent of appellant; and, second, that the Minneapolis & Rainy River Railroad was organized and operated as a common carrier, and that such railroad did not receive or take possession of the logs for the purpose of transportation until they were delivered in the booms at the hoists. The fact that the Itasca Lumber Company for its own convenience banked the logs on the ice and afterwards towed them through the lakes to the hoists, rather than haul them over the ice and deliver them within the booms at the hoists during the cutting season, in the winter, did not change the character of the relation between appellant and that company. Either process constituted a part of the work of delivering the logs for exportation.

From what has been said it follows that the logs which had been banked in Hatch's Lake were still in the process of delivery to the railroad company when they were being sluiced through the channel preparatory to towing them to the hoists on Big Turtle Lake. No portion of the logs having been delivered to the railroad company until after May 1, 1905, they were subject to taxation for that year.

Judgment affirmed.