SUNDAY LAKE IRON CO. v. TOWNSHIP OF WAKEFIELD.[1]

1. TAXATION — MINES AND MINING — FRAUD — EVIDENCE—ASSESS-
MENT.

In an action to recover back taxes paid under protest by
a mining corporation, the question of fraud in over-
valuing the property is for the jury only if there is legiti-
mate evidence to raise the issue, and the question
whether or not there is any probative evidence of fraud
is a question of law for the court.

2. SAME—FRAUD—PRESUMPTIONS.

Fraud is never presumed; there must be evidence tending
to prove it. It must be something more than an honest
mistake in judgment to defeat a tax.

3. SAME. .

Mere excessiveness does not evince fraudulent conduct on
the part of the officials, if they have not acted from im-
proper motives: but if the assessment is purposely made
too high through prejudice or a reckless disregard of
duty in opposition to what must necessarily be the judg-
ment of all competent persons, the case is a plain one
for equitable relief.

4. SAME—APPRAISAL—EQUITY.

Evidence that, in valuing the plaintiff's mine, the State tax
commissioners used information obtained from mining
experts, also taking into consideration the Finlay method
of appraisal; that one or more of the commissioners was
familiar with mining and exploration, and that no malice
or bad faith was established, did not tend to show fraud:
the assessment, whether too high or not, was valid.

5. SAME—STATE TAX COMMISSION.

Evidence held, to be insufficient to show reckless disre-
gard of duty on the part of the commissioners, in opposi-
tion to what must necessarily be the judgment of all
competent persons or to warrant the finding that mining
property was fraudulently overvalued in relation to other
property.

[1] Removed to United States Supreme Court by writ of error
October 8, 1915.

Error to Gogebic; Cooper, J.    Submitted January 7, 1914.    (Docket No. 3.)    Decided June 14, 1915.

Assumpsit by the Sunday Lake Iron Company against the township of Wakefield to recover back taxes paid under protest.    Judgment for defendant on a verdict directed by the court.    Plaintiff brings error.    Affirmed.

*William P. Belden* (*Horace Andrews*, of counsel), for appellant.

*J. A. O'Neill* and *Le Gendre & Driscoll*, for appellee.

KUHN, J.    This action is brought in assumpsit to recover from the defendant $31,910.45 in taxes on its property for the year 1911, paid by the plaintiff under protest.    At the conclusion of the testimony, the trial court directed a verdict for the defendant of no cause of action, and, judgment being entered thereon, plaintiff brings the case to this court for review by writ of error.

The property of the plaintiff was assessed in the years 1910 and 1911 by the township supervisor at $65,000.    In 1911, the board of State tax commissioners, acting under authority of legislative enactment (Act No. 114, Pub. Acts 1911), employed an expert mining engineer, Mr. James R. Finlay, of New York City, to assist it in making an appraisal of the value of the mining properties throughout the State. Mr. Finlay, assisted by Dr. C. K. Leith, professor of geology in the University of Wisconsin, and others, made an investigation of these properties extending over a period of three months, and made a report to the board of State tax commissioners with reference thereto on August 18, 1911, which report contained a valuation of the plaintiff's property.    The method pursued by Mr. Finlay and his assistants in making

this appraisal is set forth and commented upon in the opinion of this court written by Mr. Justice OSTRANDER, in the case of *Newport Mining Co.* v. *City of Ironwood,* 185 Mich. 668 (152 N. W. 1088). Mr. Finlay's estimate of the value of the property of the plaintiff company was $1,460,000.

At a hearing by the State board of tax commissioners in the village of Bessemer in October, 1911, held for the purpose of reviewing the assessments of mining properties in the township of Wakefield, the board raised the assessment of plaintiff's property from $65,000 to $1,071,000. At this hearing the plaintiff, by its representative, objected to the assessment on the grounds that:

*First,* the valuation was grossly in excess of the true cash value; *second,* the Finlay method of determining the value was contrary to the manner in which other property was assessed throughout the State; and, *third,* it was not proportionate to the assessment of other property generally in Wakefield township.

The claims that are now urged by counsel for appellant are stated by them in their brief as follows:

"(1) That the said board committed a fraud upon the rights of the plaintiff in wilfully raising the assessment of its property to an amount in excess of its true value, while at the same time with full knowledge of the general underassessment of other property it wrongfully refused to raise or increase at all the assessment of such other property, with the purpose and effect of making the plaintiff pay more than its just proportion of the taxes for the year 1913.

"(2) That the action of the State board here complained of resulted in denying to the plaintiff the equal protection of the laws of the State of Michigan, and in substance and effect took the plaintiff's property without due process of law, in violation of the provisions of the fourteenth amendment to the Constitution of the United States.

"(3) That the board of State tax commissioners

wilfully and fraudulently imposed upon the property of the plaintiff an assessed valuation grossly in excess of its true cash value.

"(4) That the plaintiff is entitled on this record to have judgment entered in its favor."

In general, it is plaintiff's claim that Mr. Finlay obtained his results without personal examination and acted largely on information derived from maps and knowledge obtained from Mr. Leith, his assistant, who did visit the mine, and that acting upon this information he estimated that the ore deposit in the Sunday Lake and Brotherton mines—the latter adjoins the former on the west—contained 3,500,000 tons, 1,500,000 of which he judged were in the Sunday Lake property. Witnesses were produced on the part of the plaintiff who testified that the deposit in the plaintiff's mine could not be expected to exceed 400,000 tons, and that its value was not over $550,000, and on the trial a map was produced showing a dyke which underlaid the Brotherton mine and dipped toward the east, below which drilling had discovered no ore. There was evidence that the approach to this dyke in the Brotherton mine had been indicated by an increasing amount of non-Bessemer ore, and that subsequent developments in 1912 showed that the Brotherton mine did not bear out the expectations of 1911, one of the plaintiff's witnesses saying it had run out; and also that on the twentieth level in the Brotherton mine (the lowest level in 1911) the dyke was running in a downwardly direction, but, at the intersection of the twenty-first level, reached in 1912, it had changed its course to a more horizontal direction, the engineer who had prepared the map saying that it was flattening rapidly toward the east. Coupling this evidence with the fact that the amount of non-Bessemer ore was increasing rapidly in the Sunday Lake mine, the plaintiff contends that it is wellnigh certain that the dyke

will soon be encountered and the ore exhausted in the Sunday Lake mine.

It is defendant's claim that the record shows that these claims on the part of the plaintiff are met by the testimony of Mr. Finlay, who said that in making his valuation he had considered the presence of the dyke, and that the ore body had been showing an enlargement in the Sunday Lake property which would make unnecessary the depth assumed by the plaintiff to be required to develop 1,500,000 tons; also, the testimony of Dr. Leith, who said that a subsequent examination of the mine in 1912 did not modify, in his opinion, the value fixed by Mr. Finlay; also, the admission of plaintiff's witness Crowell, a mining engineer, who stated that he thought the dyke would eventually get to Sunday Lake mine, but "just what angle it will assume when it comes there I cannot say."

In the opinion of this court in the *Newport Mining Company Case, supra,* we have discussed and determined the propriety of the Finlay method of appraising mining property and of the use of such an appraisal by the State board of tax commissioners in reviewing the assessments. Indeed, in this case no serious criticism is made of that method of appraisal, and it is said that it, "when based upon correct factors and assumptions, might produce reasonably satisfactory results." It is insisted, however, that, because it was hastily and superficially applied in the instant case, it resulted in a legal fraud, in that the property of the plaintiff company was assessed grossly in excess of its true cash value. It is urged that, as a matter of law, the proof of fraud does not require the establishment of an evil or vicious intent on the part of the State board of tax commissioners, and that all that it is necessary to show is that the act in question was wrongful and that it was inten-

tionally done, and that if its result was to produce injury it is fraudulent in the eye of the law.

With reference to this claim, the learned trial judge in his charge said:

"We find that the State board of tax commissioners took these figures of Mr. Finlay of $1,460,000 and considered them, and considered the method by which he placed the value upon the mine, and then made a reduction of approximately $388,000 from those figures, making the assessment as fixed by the State board of tax commissioners at $1,072,000; the State board of tax commissioners having raised the property from $65,000 to $1,072,000. The immense difference between Mr. Finlay's figures and the State board of tax commissioners, approximately $388,000, shows conclusively that they did not accept all of his figures, but made an enormous allowance from his figures; in fact, they cut them approximately 26 per cent., so that the State board of tax commissioners assessed this property at 26 per cent. below its cash value as fixed by Mr. Finlay.

"I find no evidence in this case which would justify the court in arriving at a conclusion that the State board of tax commissioners acted fraudulently towards this plaintiff, or unjustly. The evidence all indicates that they used their best judgment and their honest endeavors, assisted by the State, in having this expert employed, and, after an expenditure of many thousands of dollars in getting this information, I think there is but one conclusion, and that is that the State board of tax commissioners acted fairly, honestly, and justly towards this plaintiff in arriving at this valuation upon the property in question, and there is nothing to justify the court in setting aside their action and finding a verdict in favor of the plaintiff. I know of no way by which a more accurate or just method could be found for getting at the value of these mines."

The law in this State with reference to fraudulent overvaluation for taxation purposes has recently had the consideration of this court, in the case of *Island Mill Lumber Co.* v. *City of Alpena,* 176 Mich. 575,

579 (142 N. W. 770), in which Mr. Justice STEERE, in speaking for the court, said:

"Counsel for plaintiff contend that the question of fraud is never a question of law, but is always held by all courts to be a question of fact for the jury, citing numerous cases. This is unquestionably correct, when there is in the case legitimate evidence of fraud to raise the issue, but whether or not there is any probative evidence of fraud in the case is a question of law for the court. Fraud is never presumed; there must be evidence tending to prove it. The law upon the question of fraudulent overvaluation for taxation purposes is well settled in this State. It must be something more than an honest mistake in judgment to defeat a tax. In 2 Cooley on Taxation (3d Ed.), p. 1459, it is said:

"'An assessment is not fraudulent merely because of being excessive, if the assessors have not acted from improper motive; but, if it is purposely made too high through prejudice or a reckless disregard of duty in opposition to what must necessarily be the judgment of all competent persons, * * * the case is a plain one for the equitable remedy by injunction.'

"In such case the tax is necessarily invalid.

"The above rule has been quoted by this court with approval and consistently followed. The subject is exhaustively discussed, with citation of numerous authorities, in *Pioneer Iron Co.* v. *City of Negaunee*, 116 Mich. 430 (74 N. W. 700), and *City of Muskegon* v. *Boyce*, 123 Mich. 535 (82 N. W. 264)."

See, also, *City of Port Huron* v. *Wright*, 150 Mich. 279 (114 N. W. 76).

After a careful consideration of this record and the plaintiff's claims, and considering all the testimony produced in the light most favorable to the plaintiff, without determining the relevancy of such testimony as was admitted to show changes in conditions subsequent to the assessment, we cannot agree that there is any evidence to sustain the charge that the State board of tax commissioners, in disregard of its duty, recklessly or intentionally or fraudulently overvalued

the plaintiff's property for taxation. Applying the rule cited above in the *Island Mill Lumber Co. Case* from Cooley on Taxation, it cannot be said that the State board of tax commissioners acted in "reckless disregard of duty, in opposition to what must necessarily be the judgment of all competent persons." In fixing the value of this mine the State board did use the information produced for it by disinterested experts of a high standing, in accordance with authority granted by an act of the legislature of this State. The figure arrived at may possibly have been in fact too high or too low, but Mr. Shields, one of the commissioners, who himself had charge of the review, and was familiar with the development of iron mines on the Gogebic range and its ore formation, we are convinced, acted honestly, fairly, and in good faith upon all the information he had at hand, and made a proper and legal assessment in fixing the value of plaintiff's mine in the way that he did.

The claim is also made, as was made in the *Newport Case, supra,* that the value of one class of property—mining property—was raised and the values of other classes of property known to be undervalued were not raised, and that such intentional inequality of assessment constitutes fraud and invalidates the tax. This is based largely upon claimed admissions of Mr. Shields of his knowledge of the undervaluation of other property in the State and in that locality, and the fact that great increases were made in the assessment of other than mining property in the year 1912.

An examination of the evidence in this record is convincing that the business of the defendant township depended almost entirely upon the mining business, and the mine of the plaintiff company, which was one of the largest mines in the township, in 1911 was assessed at the small sum of $65,000, although

plaintiff now admits that it is reasonably worth the sum of $450,000. People, generally, at least, did not know the extent of the ore deposits, and it appears that business was dull. It further appears that after the report of the Finlay appraisal was made public, disclosing the value and the long life of the mines in the township, business conditions in the village and township of Wakefield became better and the values of property increased. These changed conditions, it may be said, at least in part, accounted for the increased assessments in 1912, and, as in the *Newport Case,* we are in the instant case unable to find any specific data in this record to sustain the conclusion that the nonmining property in the defendant township was not assessed relatively as high in 1911 as was the mining property.

. We are convinced that the trial judge arrived at the proper conclusion in directing a verdict for the defendant upon this record, and the judgment is therefore affirmed.

BROOKE, C. J., and MCALVAY, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.