CHAMPLAIN REALTY COMPANY *v.* TOWN OF BRATTLEBORO.

Special Term at Brattleboro, February, 1921.

Present: WATSON, C. J., POWERS, TAYLOR, MILES, and SLACK, JJ.

Opinion filed May 7, 1921.

*Taxation—Products Intended for Exportation to Another State —Action to Recover Tax Paid—Burden on Plaintiff to Show Illegal Assessment—Interstate Commerce—Property in Transit from One State to Another Exempt from Local Taxation—When Property Becomes Subject to Interstate Commerce—Interruption in Transportation—Findings Presenting Questions of Law.*

1. Products of the State intended for exportation to another state do not cease to be a part of the general mass of property in the State, subject as such to its jurisdiction and to taxation in the usual way, until they have been shipped or entered with a common carrier for transportation to another state, or have started upon such transportation in a continuous route or journey.

2. In an action to recover money paid as a tax, the burden is on the plaintiff to show that the tax was illegally assessed.

3. While property actually in transit from one state to another is exempt from local taxation as an unlawful interference with interstate commerce, there may be an interior movement of property which does not constitute interstate commerce, although it comes from or is destined to another state.

4. The State has power to tax its own products while within its jurisdiction, although intended for exportation, if taxed as

part of the general mass of property in the State, unless and until such products have become the subject of interstate commerce.

5. When goods are transported from one state to another by means other than by a common carrier, the state's jurisdiction over them ends when they have started for transportation out of the state in a continuous journey; all movements within the state preparatory to the final movement being preliminary to interstate transportation and not a part of it.

6. Where pulpwood cut in this State and destined to another state was floated down a river wholly in this State to its mouth in the Connecticut River, where it was held until the receding waters in the Connecticut River made it practicable and safe to float it to its destination, the wood, while so held, was for its owner's benefit, and had not started on its final movement to the other state, and was subject to local taxation.

7. The court's finding that the drive of the pulpwood was in continuous operation and was conducted properly to make an uninterrupted passage, so far as possible, cannot affect the result; as the essential facts, which showed that there was an interruption, and the occasion of it, were not in controversy, and made the conclusion to be drawn therefrom a question of law.

ACTION OF CONTRACT to recover taxes paid under protest. Trial by Court at the April Term, 1920, Windham County, *Stanton,* J., presiding. Judgment for the plaintiff. The defendant excepted. The opinion states the case.

*Arthur P. Carpenter* and *Ernest W. Gibson* for the defendant.

*Harvey, Maurice, Whitney & Fitts* for the plaintiff.

TAYLOR, J. In this action the plaintiff seeks to recover taxes paid under protest. The plaintiff is a corporation organized under the laws of New York, but at all times material to this inquiry duly authorized to do business in this State. It was listed for taxation in the defendant town in the year 1919 in part on account of certain property on which the taxes were paid without objection. The dispute arose over 1,500 cords of pulp-

wood which was appraised and set in the list at $30,000. The plaintiff filed a tax inventory of its property in Brattleboro on April 1, 1919, wherein it specified that it was the owner of 1,500 cords of pulpwood situated in the town of Brattleboro on the West River and its banks, but claimed that the same was not taxable as it was in transit in interstate commerce. The various taxes payable to the defendant town, assessed on so much of the plaintiff's list as related to this pulp aggregated $485.50. These taxes were paid under protest, and this action immediately brought for their recovery. The cause was tried by court, and on the facts found judgment was rendered for the plaintiff. It is here for review on defendant's exceptions, which include an exception to the judgment.

The only objection to the validity of the tax was and is that the pulpwood for which the plaintiff was taxed was on April 1, 1919, in transit in interstate commerce, and so outside the taxing power of the State. As bearing upon this question the court found the following facts: During the winter of 1918-19, the plaintiff cut pulpwood, in all about 10,000 cords, in the towns of Jamaica, Stratton, Londonderry, and Winhall in this State. The plaintiff maintains a mill at Hinsdale, in the state of New Hampshire, about three miles below Brattleboro, where its pulpwood is rossed and bolted. The wood, cut four feet long, was placed upon the banks of West River and its tributaries to be floated down into the Connecticut and thence to its destination at the mill in Hinsdale. The waters of the West River are wholly in this State and empty in the town of Brattleboro into the Connecticut. West River and its tributaries had been used for driving pulpwood to the mill at Hinsdale in the years 1917 and 1918. A single log boom is provided at the mill to receive the wood floated down the river, but is incapable of holding it all when the water in the Connecticut is high and the current swift, and the wood is liable to be carried over and drawn under the boom and lost. A pond of considerable size is formed near the mouth of West River in the town of Brattleboro by water set back from the Connecticut by the dam at Vernon. Plaintiff maintains a boom at this point to hold and control the logs driven down West River until the water in the Connecticut has receded sufficiently to permit of their being held in the boom at Hinsdale.

On March 25, 1919, the plaintiff began putting the pulpwood into the West River and its tributaries, the water in these

streams then being high, intending to drive it down the river and thence into the Connecticut and down that river to its mills in Hinsdale. In anticipation of the probable high water in the Connecticut, plaintiff had previously placed its boom across West River near its mouth to hold the wood there until the water in the Connecticut had receded enough to allow it to be held at the mill at Hinsdale. The wood floated down West River on the high water, and the head of the drive reached the boom at the mouth of West River on March 27, 1919. At that time the Connecticut was so high and its current so swift that it was not thought safe to let the wood into that river, as it could not be held at the Hinsdale boom. For this reason and no other the plaintiff held its wood in the boom at Brattleboro. The Connecticut was not suitable for driving pulpwood from the time the drive began until April 3, on which date the plaintiff's servants cut the boom at the mouth of West River so that the wood could pass into the Connecticut. Prior to April 3 only about 4,000 cords of the wood had reached and been held at the West River boom. The balance arriving later went through to Hinsdale without stopping. On March 28, 1919, when there was by estimation about 4,000 cords of wood in the West River boom, it broke, allowing some of the wood to escape into the Connecticut and onto the Retreat meadow in Brattleboro near the mouth of West River. The boom was repaired on March 29, 1919. At this time the part of West River where the wood laid back of the boom, called the holding ground, was frozen, so the wood, if not boomed, could not have continued on its journey into the Connecticut at that time. On April 1, 1919, about 1,500 cords of the pulpwood were being held in plaintiff's boom at the month of West River. Some wood that was lodged on an island and the wood on the Retreat meadow remained after the boom was cut. The latter remained on the meadow about two weeks and had to be taken out by a process called "booming" or "warping". None of this 1,500 cords was cut in the town of Brattleboro. All of it had been carried down West River and was destined for the plaintiff's mill at Hinsdale, New Hampshire, by way of the Connecticut. The drive of pulpwood down West River to the Connecticut and thence to the rossing plant at Hinsdale was in continuous operation from March 25 until it was completed on May 9, and was conducted properly to make an uninterrupted passage, so far as possible.

[1]    No question is made but that the pulpwood on account of which the plaintiff was taxed, *viz.*, the 1,500 cords of wood held in the boom on April 1, 1919, was taxable in the defendant town unless within the protection afforded by the commerce clause of the Federal Constitution. The parties do not disagree as to the general rule governing this class of cases. Products of a state intended for exportation to another state do not cease to be a part of the general mass of property in the state, subject as such to its jurisdiction and to taxation in the usual way, until they have been shipped or entered with a common carrier for transportation to another state, or have been started upon such transportation in a continuous route or journey, or, as otherwise stated, until they have entered upon their final journey, out of the state. *Coe* v. *Errol,* 116 U. S. 517, 525, 29 L. ed. 715, 719, 6 Sup. Ct. 475; *Diamond Match Co.* v. *Village of Ontonagon,* 188 U. S. 82, 47 L. ed. 394, 23 Sup. Ct. 266. As frequently happens, the difficulty in this case arises in the application of the settled rule to the facts found. Here the wood was being transported by the plaintiff, its owner, and was subject at all times to its complete control, so the rule laid down when the transportation is by a common carrier does not apply. It is not a case where goods from outside the state are detained in transit within the state. Such goods are already under the protection of the Constitution when they cross the border and are subject to a different rule. *Coe* v. *Errol, supra.* Applied to products of the state intended for exportation, the precise question is when they acquire the impress of interstate commerce.

[2]    It is well to note at the outset that, this being an action to recover money paid as a tax, the burden is upon the plaintiff to show that the tax was illegally assessed, or, to be specific, to establish the interstate character of the transportation. *Sullivan* v. *Ashfield,* 227 Mass. 24, 116 N. E. 565; *Forsyth* v. *County Com'rs* (Mass.), 123 N. E. 699; *Jackson* v. *Town of Union,* 82 Conn. 266, 73 Atl. 773; *Warwick & Coventry Water Co.* v. *Carr,* 24 R. I. 226, 52 Atl. 1030; *Portland, etc., R. Co.* v. *City of Saco,* 60 Me. 196; *Savings & Loan Co.* v. *City of San Francisco,* 146 Cal. 673, 80 Pac. 1086; *Iron Co.* v. *Township,* 186 Mich. 626, 153 N. W. 14; *Houston* v. *King County,* 90 Wash. 200, 155 Pac. 773; *Hardware Co.* v. *La Plata County,* 52 Colo. 260, 121 Pac. 157; *Davis* v. *Otoe Co.,* 55 Neb. 677, 76 N. W. 465. See

*Babcock* v. *Granville,* 44 Vt. 325; *City of St. Louis* v. *Niehaus,* 236 Mo. 8, 139 S. W. 450.

We have no cause in point.   The defendant relies upon *Guilford* v. *Smith,* 30 Vt. 49, but the decision in that case sheds no light on the question at issue here.   That was an action in replevin and involved the right of stoppage *in transitu* where flour shipped by the vendor from a point in Canada, consigned to parties in Ogdensburg, N. Y., to be forwarded to the vendee in Burlington, Vt., was held in storage at Ogdensburg awaiting forwarding orders.   It was held in the circumstances, which we need not detail, that the vendee had acquired constructive possession of the flour, and that the transit was at an end, as the flour had reached a place where it awaited a fresh direction to be given to it by the vendee, and so was not being held to transport, but to keep, when the vendor attempted to exercise the right of stoppage.

[3]   As the case presents a Federal question, it is controlled by principles to be found in the decisions of the Supreme Court of the United States.   There are three distinct classes of decisions fixing the limits of state and Federal authority when the question of interstate transportation is involved.   In one class the question is when the article ceases to be the subject of interstate commerce because of the termination of the transportation.   In another class are cases dealing with the status of property which has become the subject of interstate commerce, but is detained in transit for one cause or another before reaching its final destination.   Then there is the class where, as here, the question is when the state loses jurisdiction over its own products for the reason that they have passed under Federal authority.   Counsel cite cases of the different classes indiscriminately, without taking note of distinctions clearly recognized in some of the cases, though not always definitely pointed out.   The basic principle of all the cases is the same.   Property actually in transit from one state to another is exempt from local taxation as an unlawful interference with interstate commerce.   Moreover, it is a principle common to the several classes of cases that there may be an interior movement of property which does not constitute interstate commerce, though it come from or be destined to another state.   But when interstate transportation begins, when it is suspended so that the commodity becomes subject to state laws, or when it ends, are questions requiring the application of dif-

ferent principles. It is manifest that we are concerned only with the question when interstate transportation begins. As the principles vary with the questions under discussion, we shall avoid unnecessary confusion by giving particular attention to the views of the Court in that class of cases.

The leading case is *Coe* v. *Errol, supra,* in error to the Supreme Court of the state of New Hampshire. It was heard below on plaintiff's petition for the abatement of taxes assessed on certain logs owned by the plaintiff and others lying in the town of Errol on the date of the annual appraisal for taxation, ready to be floated down the Androscoggin River to Lewiston, Me., to be manufactured and sold. Part of the logs had been cut in the state of Maine and were on their way of being floated to Lewiston, but were detained in the town of Errol by low water. Part of the logs had been drawn the winter before from a neighboring town in New Hampshire and placed in Clear Stream and on its banks in the town of Errol to be floated down the Androscoggin River. The selectmen of Errol appraised all of the logs for taxation and assessed the usual taxes thereon. Plaintiff claimed that none of the logs were subject to taxation in Errol for the reason that they were in transit to market from one state to another. The Supreme Court of New Hampshire abated the portion of the tax assessed upon the logs cut in Maine and sustained the assessment upon those cut in New Hampshire. The plaintiff carried the case to the Supreme Court of the United States on a writ of error to review so much of the decision as was adverse, on which the judgment below was affirmed. Mr. Justice Bradley, speaking for the Court, said that the question for consideration was whether the products of a state, although intended for exportation to another state and partially prepared for that purpose by being deposited at a place or port of shipment within the state, were liable to be taxed like other property within the state. After observing that the question does not present the predicament of goods in course of transportation through a state, although detained for a time within the state by low water or other causes of delay, as was the case of the logs cut in the state of Maine on which the tax was abated, the general proposition is laid down that the logs in question would be under the protection of the Constitution when actually started in the course of transportation to another state, or delivered to a carrier for such transportation. We quote somewhat extensively from the argu-

ment that follows for the light which it sheds upon the application of the rule to the facts of the particular case: "There must be a point of time when they [goods intended for transportation out of the state] cease to be governed exclusively by the domestic law and begin to be governed and protected by the national law of commercial regulation, and that moment seems to us to be a legitimate one for this purpose, in which they commence their final movement for transportation from the state of their origin to that of their destination. When the products of the farm or the forest are collected and brought in from the surrounding country to a town or station serving as an *entrepôt* for that particular region, whether on a river or a line of raiload, such products are not yet exports, nor are they in process of exportation, nor is exportation begun until they are committed to the common carrier for transportation out of the state to the state of their destination, or have started on their ultimate passage to that state. Until then it is reasonable to regard them as not only within the state of their origin, but as a part of the general mass of property of that state, subject to its jurisdiction, and liable to taxation there, if not taxed by reason of their being intended for exportation, but taxed without discrimination, in the usual way and manner in which such property is taxed in the state * * *. If such goods are not taxed as exports, nor by reason of their exportation, or intended exportation, but are taxed as part of the general mass of property in the state, at the regular period of assessment for such property and in the usual manner, they not being in the course of transportation at the time, is there any valid reason why they should not be taxed? Although intended for exportation, they may never be exported; the owner has a perfect right to change his mind; and until actually put in motion, for some place out of the state, or committed to the custody of a carrier for transportation to such place, why may they not be regarded as still remaining a part of the general mass of property in the state? If assessed in an exceptional time or manner, because of their anticipated departure, they might well be considered as taxed by reason of their exportation or intended exportation; but if assessed in the usual way, when not under motion or shipment, we do not see why the assessment may not be valid and binding. * * * No definite rule has been adopted with regard to the point of time at which the taxing power of the state ceases as to goods exported to a foreign country or to another state. What we

have already said, however, in relation to the products of a state intended for exportation to another state will indicate the view which seems to us the sound one on that subject, namely, that such goods do not cease to be a part of the general mass of property in the state, subject, as such, to its jurisdiction and to taxation in the usual way, until they have been shipped or entered with a common carrier for transportation to another state or have been started upon such transportation in a continuous route or journey. We think this must be the true rule on the subject. It seems to us untenable to hold that a crop or herd is exempt from taxation merely because it is, by its owner, intended for exportation. If such were the rule, in many states there would be nothing but the lands and real estate to bear the taxes. Some of the western states produce very little, except wheat and corn, most of which is intended for export; and so of cotton in the southern states. Certainly, as long as these products are on the lands which produce them, they are part of the general property of the state. And so we think they continue to be until they have entered upon their final journey for leaving the state and going into another state. It is true, it is said in the case of *The Daniel Ball,* 10 Wall. 565, 19 L. ed. 1002: 'Whenever a commodity has begun to move as an article of trade from one state to another, commerce in that commodity between the states has commenced.' But this movement does not begin until the articles have been shipped or started for transportation from the one state to the other. The carrying of them in carts or other vehicles or even floating them to the depot where the journey is to commence is no part of that journey. That is all preliminary work, performed for the purpose of putting the property in a state of preparation and readiness for transportation. Until actually launched on its way to another state, or committed to a common carrier for transportation to such state, its destination is not fixed and certain. It may be sold or otherwise disposed of within the state, and never put in course of transportation out of the state. Carrying it from the farm or the forest to the depot is only an interior movement of the property, entirely within the state, for the purpose, it is true, but only for the purpose, of putting it into a course of exportation; it is no part of the exportation itself. Until shipped or started on its final journey out of the state its exportation is a matter altogether *in fieri,* and not at all a fixed and certain thing * * *. The logs

which were taxed, and the tax on which was not abated by the Supreme Court of New Hampshire, had not, when so taxed, been shipped or started on their final voyage or journey to the state of Maine. They had only been drawn down from Wentworth's location to Errol, the place from which they were to be transported to Lewiston in the state of Maine. There they were to remain until it should be convenient to send them to their destination. They come precisely within the character of property which, according to the principles herein laid down, is taxable.''

Another case of the same class is *Diamond Match Co.* v. *Village of Ontonagon,* 188 U. S. 82, 47 L. ed. 394, 23 Sup. Ct. 266. The plaintiff, an Illinois corporation engaged in the manufacture and sale of matches in the city of Chicago, was the owner of a large amount of pine wood, timber, etc., situated on the Ontonagon River and its tributaries in the state of Michigan. It also operated sawmills located at Green Bay in the state of Wisconsin for manufacturing its logs into lumber. The route of the logs from the forests to the mills was as follows: They were driven down Ontonagon River and its tributaries to a boom near its mouth in the defendant village, where they were loaded aboard cars and shipped by rail to Green Bay. Owing to a forest fire which burned over the plaintiff's lands, and for the purpose of preserving the timber, logs were cut from the burned tract largely in excess of what the plaintiff could utilize in any one season at its mills. They were floated down to booms some distance above the boom near the mouth of the river and outside the limits of the village of Ontonagon, where they were held to be sent on to the lower boom as fast as they could be transported by rail and manufactured into lumber. Such was the situation of the logs in controversy at the close of the season of 1898, except about 500,000 feet which were in the lower boom awaiting transportation. The statute of Michigan under which the assessment was made provided that property in transit to some place without the state should be assessed at the place in the state nearest to the last boom or sorting gap of the stream in or bordering on the state in which said property will be last floated during the transit thereof. In April, 1899, before the condition of the river permitted movement of the logs, the village of Ontonagon assessed the tax in question. It was contended that the movement of the logs commenced when they first started on their course down the river, and from that time were in con-

tinuous transit as subjects of interstate commerce. The Court
restated the holdings in *Coe* v. *Errol,* and in its decision sustain-
ing the tax remarked that the contention was more extreme than
that made and rejected in the latter case. In the course of the
argument Mr. Justice McKenna, who delivered the opinion, said:
"No purpose to burden interstate commerce is evident in the
statute, and the power of the state to tax everything which is
part of what has been called 'the general property' or 'the gen-
eral mass of property' of the state is undoubted. But things
which have been brought to a state may not have reached that
condition. Things intended to be sent out of the state, but
which have not left it, may not have ceased to be in that condi-
tion. The exact moment in either case may not be easy to point
out, may be confused by circumstances; and the confident assign-
ment of the property as subject or not subject to taxation is not
easily made." Then follows a review of the cases, including
*Kelley* v. *Rhoads,* 188 U. S. 1, 47 L. ed. 359, 23 Sup. Ct. 259;
*Brown* v. *Houston,* 114 U. S. 622, 29 L. ed. 257, 5 Sup. Ct. 1091;
*Pittsburg, etc., Coal Co.* v. *Bates,* 156 U. S. 577, 39 L. ed. 538,
15 Sup. Ct. 415. Their substance, as defining the taxing power
of a state, is declared to be that while the property is at rest
for an indefinite time awaiting transportation it is subject to
taxation; but, if it be actually in transit to another state, it be-
comes the subject of interstate commerce and is exempt from
local assessment.

No other decision of the Supreme Court of the United
States involving the right of a state to tax products thereof
destined for export is called to our attention. *Bacon* v. *Illinois,*
227 U. S. 504, 57 L. ed. 615, 33 Sup. Ct. 299, is referred to. In
that case grain shipped from Southern and Western states under
contracts for transportation to Eastern points with the privilege
of removing it from the cars at Chicago for the purpose of in-
specting, weighing, cleaning, mixing, etc., was purchased by the
plaintiff while in transit. Upon its arrival at Chicago plaintiff
availed himself of the privilege and removed the grain to his
private elevator, solely for the purpose specified. The grain re-
mained in the elevator only for such time as was reasonably
necessary for the purposes mentioned, when it was turned over
to the railroad companies and forwarded by them to its original
destination in accordance with the contracts of transportation.
The grain was taxed to the plaintiff while at rest in the elevator.

The Supreme Court of Illinois sustained the tax on the ground that the grain was not exempt from local taxation as being in transit in interstate commerce. Mr. Justice Hughes delivered the opinion of the Court affirming the judgment below. While the question for decision was dissimilar, in that the case involved the question when property being transported through the state was subject to taxation, still the opinion announces principles that are applicable to the case at bar. It is said that the denial of the power to tax articles actually moving in interstate transportation rests upon the supremacy of the Federal power to regulate interstate commerce. Its postulate is the necessary freedom of that commerce from the burden of such local exactions as are inconsistent with the control and protection of that power. The question is determined by the nature and effect of the particular state action with respect to a subject which has come under the sway of a paramount authority. The question was said to be whether the grain there involved was moving in interstate commerce so that the imposition of the local tax may be said to be repugnant to the Federal power. We quote from the opinion: "Neither the fact that the grain had come from outside the state, nor the intention of the owner to send it to another state, and there to dispose of it, can be deemed controlling when the taxing power of the state of Illinois is concerned. The property was held by the plaintiff in error in Chicago for his own purposes and with full power of disposition. It was not being actually transported, and it was not held by carriers for transportation. The plaintiff in error had withdrawn it from the carriers. The purpose of the withdrawal did not alter the fact that it had ceased to be transported and had been placed in his hands. He had the privilege of continuing the transportation under the shipping contracts, but of this he might avail himself or not as he chose. He might sell the grain in Illinois or forward it, as he saw fit. It was in his possession, with the control of absolute ownership. He intended to forward the grain after it had been inspected, graded, etc., but this intention, while the grain remained in his keeping, and before it had been actually committed to the carriers for transportation, did not make it immune from local taxation. He had established a local facility in Chicago for his own benefit, and while, through its employment, the grain was there at rest, there was no reason why it should not be included with his other property within the state in an assess-

ment for taxation which was made in the usual way, without discrimination. [Citing cases.] The question, it should be observed, is not with respect to the extent of the power of Congress to regulate interstate commerce, but whether a particular exercise of state power, in view of its nature and operation, must be deemed to be in conflict with this paramount authority. * * * The property was held within the state for purposes deemed by the owner to be beneficial; it was not in actual transportation; and there was nothing inconsistent with Federal authority in compelling the plaintiff in error to bear with respect to it, in common with other property in the state, his share of the expenses of local government."

*General Oil Co.* v. *Crain,* 209 U. S. 211, 52 L. ed. 754, 28 Sup. Ct. 475, involved the same principle. Oil which had been brought from Pennsylvania to Memphis, Tenn., a distributing point, was held in tanks, one of which was kept for oil for which orders had been received from Southern points outside the state prior to the shipment from Pennsylvania, and which had been shipped especially to fill such orders. The tank was marked "Oil already sold in Arkansas, Louisiana and Mississippi." The oil remained in the tank only a few days—long enough to be properly distributed according to the orders. The local tax upon the oil was sustained: *Susquehanna Coal Co.* v. *South Amboy,* 228 U. S. 665, 57 L. ed. 1015, 33 Sup. Ct. 712, is another case involving the cessation of interstate commerce. Coal was shipped by its owner, the plaintiff in error, from points in Pennsylvania to its own order at a New Jersey tidewater port destined to points outside the latter state where, if boats were not available for its continuous transportation, it was dumped into a storage yard to be later transferred to boats as occasion required. It was held subject to local taxation while awaiting reshipment. The Court said: "The coal, therefore, was not in actual movement through the state; it was at rest in that state, and was to be handled and distributed from there." On the authority of the two cases last referred to it was held that, while the delay was to be temporary, a postponement of the transportation of the coal to its destination, there was a business purpose and advantage in the delay which was availed of, and that, while it was availed of, the product secured the protection of the state, subjecting it to the dominion of the state.

The decisions of other courts are of little aid except as they illustrate the application of the principles announced in the decisions of the Supreme Court of the United States. Among those cited is *State* v. *Taber Lumber Co.,* 101 Minn. 186, 112 N. W. 214, 13 L. R. A. (N. S.) 800. The case involved the validity of a tax levied May 1, 1905, on certain logs owned by the defendant, a corporation engaged in the manufacture and sale of lumber products at Keokuk, Iowa. It obtained the logs for its mills from its own land in the state of Minnesota, having a continuing contract with the Itasca Lumber Company, a Minnesota corporation, to cut and transport the logs. During the winter of 1904-1905 the logs in question were cut, hauled, and piled on the ice in certain lakes. Before the ice melted in the spring the logs were enclosed in booms to prevent their becoming scattered and preparatory to driving the same to hoists maintained by a railroad where they were to be loaded onto cars and thence transported by rail out of the state. On May 1, 1905, the logs in two of the lakes had not been disturbed. Those on a third, connected by channel with still another lake reached by the railroad, had been sluiced through the channel prior to May 1, preliminary to being delivered at the hoist maintained on that lake. Subsequent to May 1 all the logs were taken from the respective places where they had been boomed and moved to the hoists, loaded, and transported in due course to the mills at Keokuk.

It was claimed that delivery to the railroad for the purpose of exportation was complete immediately the logs were banked upon the ice and the booms thrown about them preparatory to their being carried to the hoists; in other words, that this was equivalent to depositing them in the depot of the common carrier. It was further claimed that the Itasca Lumber Company, in towing the logs from the booms to the hoists, causing them to be conveyed by railroad to the Mississippi River, driving them down the river, and delivering them to the defendant, was engaged in the business of transporting the logs on their journey out of the state. The case was made to turn on the question whether on May 1 the logs had been delivered for exportation. It was held that, if they were delivered to the common carrier for transportation out of the state when they were banked and boomed on the ice, they had become subject of interstate commerce before the tax was levied; but, if towing the logs to the hoists was part of the work of delivery to the common carrier,

then, on authority of *Coe* v. *Errol,* the logs had not ceased to be a part of the general mass of property of the state when taxed. The court said: ''The question does not turn upon the length of time which existed between the banking and booming of the logs on the ice and their transportation to the hoists; nor is it a controlling factor that it was the purpose and intent of the appellant company [the defendant] from the beginning that all of the logs cut pursuant to the contract with the Itasca Lumber Company should be transported in the usual and ordinary way to its mills at Keokuk, and that in fact such result was finally accomplished during the season of 1905 * * *. In our judgment, it conclusively appears from the evidence that on that date [May 1] all of the property was still under the dominion and control of the appellant through its agent, the Itasca Lumber Company, and that a material part of the work of delivering for exportation was still to be done * * *. The fact that the Itasca Lumber Company, for its own convenience, banked the logs on the ice and afterwards towed them through the lakes to the hoists, rather than haul them over the ice and deliver them within the booms at the hoists during the cutting season, in the winter, did not change the character of the relation between the appellant and that company. Either process constituted a part of the work of delivering the logs for exportation.'' Referring especially to the logs sluiced out of the upper lake before May 1, preparatory to towing them to the hoist, the court held that they were then merely in the process of delivery to the railroad company. The judgment of the court below sustaining the tax as to all the logs was affirmed.

In *Burlington Lumber Company* v. *Willetts,* 118 Ill. 559, 9 N. E. 254, logs being floated on their way from Wisconsin down the Mississippi River to Burlington, Iowa, were detained in a boom in New Boston, Illinois, for the convenience of the owner, the plaintiff, as it would be liable to loss on the breaking up of the ice in the spring. It was held that the logs were kept at New Boston for the profit of the owner, and so were taxable there. *Prairie Oil & Gas. Co.* v. *Ehrhardt,* 224 Ill. 634, 91 N. E. 680, is relied upon by the plaintiff; but there the oil, which was being pumped in a privately owned pipe line, was in transit from a point in the state of Kansas across the state of Illinois to a point farther east. It was attempted to tax said oil in the pipes and in tanks along the line employed solely to maintain a constant flow. There was no intention to hold the oil in the

taxing district, and its progress across the state was uninterrupted except by accident.  It was held that the oil was exempt from local taxation, as it was moving in interstate commerce and had not acquired a status in Illinois so as to become part of the property of the district through which it was passing.

In the Minnesota case, as we have seen, the question was when the logs were delivered to a common carrier for transportation, while the Illinois cases illustrate the principles that apply when goods brought into the state in the course of interstate commerce are subject to taxation and when they are not.  Even in this class of cases the Federal protection from local taxation continues only while the goods are in actual transit; and if they are detained for an indefinite time during such transit, other than for natural causes or lack of facilities for immediate transportation, they may be lawfully assessed by the local authorities.  *Kelley* v. *Rhoads,* 188 U. S. 1, 47 L. ed. 359, 23 Sup. Ct. 259, and other cases there cited.  These and other decisions in cases of the same class involve a principle not applicable to the case at bar.  In such cases the cause and purpose of the interruption of the transit is of primary importance.  If the delay is merely an incident of the transportation, the goods do not lose their interstate character; but if the delay is for the benefit or convenience of the owner, and the goods are to remain at rest during his pleasure, they are not the subject of interstate commerce to the extent that they are exempt from local taxation.

[4, 5]  Stated briefly, the following principles are to be applied to the facts found in the instant case:  The state has undoubted power to tax its own products while within its jurisdiction, though intended for exportation, if taxed as part of the general mass of property in the state, unless and until such products have become the subject of interstate commerce.  The limitation of this power rests upon the supremacy of the Federal power to regulate interstate commerce, and finds its justification in the necessity that commerce between the states should be free from the burden of such local exactions as are inconsistent with the control and protection of that power.  It is only when and because the otherwise inclusive power to tax must be deemed to be in conflict with Federal authority that the power is denied; and, if the exercise of the taxing power is not inconsistent with the authority of Congress to regulate interstate commerce, no right is invaded.  In other words, the purpose of the rule under

consideration is not the exemption of property from taxation, but the protection of Federal authority. In view of the importance, both to the shipper and to the state, that the point of time should be clearly defined when state jurisdiction ends and Federal authority begins "so as to avoid all ambiguity or question" (*Coe* v. *Errol, supra*), the Supreme Court has formulated a rule applicable to products of a state intended for exportation to another state. It distinguishes between transportation by a common carrier and by other means. For obvious reasons, in case of the former Federal authority is deemed to have attached when the goods are shipped or entered with a common carrier for transportation to another state. They are then out of the control of the owner and their destination is fixed and certain. To every intent they are in transit out of the state. To mark the time with equal certainty when goods being transported in any other way pass from state to Federal control, the time when they have started for transportation out of the state in a continuous journey is selected. All movements within the state preparatory to the final movement that will carry the goods out of the state are preliminary to interstate transportation and not part of it. The intent with which the preparations for the interstate journey are made does not affect the result. Nor is the length of time between the completion of the preparations and the beginning of the movement out of the state material.

[6] Applying these principles to the circumstances of the case at bar, it seems clear that the pulpwood on account of which the plaintiff was taxed was not on April 1 beyond the taxing power of the State. It was then at rest in the boom at Brattleboro for a time necessarily indefinite and for a purpose beneficial to the plaintiff. The immediate destination of this wood and the some 2,500 cords that escaped into the Connecticut when the boom broke was the so-called "holding ground" at the mouth of West River, although its ultimate destination was Hinsdale, N. H. The findings as to the breaking of the boom and its consequences are insignificant. It was a mere accident attending the movements that were planned. The restoration of the boom was necessary to the original plan and gives undoubted character to all the pulpwood that was started on its way down West River before the boom was cut. It could not have been intended that any of it was to move out of the State until such time as the plaintiff should see fit to send it on its way. It was at rest in

this State awaiting the voluntary act of the plaintiff that should start it on its ultimate journey out of the State. It was fully in the plaintiff's control, and could be exported or not as it should see fit. It is quite immaterial that pulpwood later started on the drive went through to Hinsdale without interruption. The wood with which we are now concerned did not start on its final movement, its ultimate passage, out of the State in a continuous journey until released from the boom at Brattleboro. It could not well be said that listing it for taxation while so at rest must be deemed to be in conflict with Federal control; for it had not yet come under such authority. So far as this wood was concerned when it started on the drive, the route out of the State was not available—a fact well known to the plaintiff. The findings make it evident that the wood started down the West River and its tributaries before the Connecticut was drivable to take advantage of the high water without which West River could not be driven. For its own purposes the plaintiff maintained the boom at Brattleboro as a facility for retaining control of the pulpwood until it would be to its advantage to send it on out of the State. The movement down West River to the boom was merely preparatory to its ultimate journey out of the State. The character of this stage of the transportation is no different than it would have been if the wood had been drawn to the boom on sleds or carts. *Coe* v. *Errol, supra.*

[7]   The finding that the drive was in continuous operation from March 25 until it was completed on May 9 and was conducted properly to make an uninterrupted passage, so far as possible, does not affect the result. So far as it is a finding of fact, it must be construed in the light of the specific findings as to what actually took place; and when so read there is no inconsistency. The work on the drive continued from the time the first pulpwood was started down West River until the last wood arrived at Hinsdale. So far as possible in view of what is recited elsewhere in the findings, the drive was conducted properly to make an uninterrupted passage. But that it was not uninterrupted, as well as the occasion for the interruption, are clearly shown by the findings. The essential facts were plainly not in controversy, and made the conclusion to be drawn therefrom a question of law. *Philadelphia, etc., Ry. Co.* v. *Hancock,* 253 U. S. 284, 64 L. ed. 907, 40 Sup. Ct. 512. The fact that the transit was interrupted only as long as necessary to make it pos-

sible to send the wood on its way in safety does not change the
character of the initial transportation any more than did similar
circumstances prevent the interruption of an interstate journey
in *Bacon* v. *Illinois* and *General Oil Co.* v. *Crain, supra.*

This view of the case on the facts as found makes it un-
necessary to consider other exceptions taken at the trial.

*Judgment reversed, and judgment for ·the defendant.*