## COE *v.* ERROL.

ERROR TO THE SUPREME COURT OF THE STATE OF NEW HAMPSHIRE.

Submitted October 13, 1885.—Decided January 25, 1886.

Goods and chattels within a State are equally taxable whether owned by a citizen of the State, or a citizen of another State, even though the latter be taxed in his own State for the value of the same goods as part of his general personal estate.

Goods, the product of a State, intended for exportation to another State, are liable to taxation as part of the general mass of property of the State of their origin, until actually started in course of transportation to the State of their destination, or delivered to a common carrier for that purpose ; the carrying of them to, and depositing them at, a depot for the purpose of transportation is no part of that transportation.

When goods, the product of a State, have begun to be transported from that State to another State, and not till then, they have become the subjects of inter-state commerce, and, as such, are subject to national regulation, and cease to be taxable by the State of their origin.

Goods on their way through a State from a place outside thereof to another place outside thereof, are in course of inter-state or foreign transportation, and are subjects of inter-state or foreign commerce, and not taxable by the State through which they are passing, even though detained within that State by low water or other temporary cause.

Logs cut at a place in New Hampshire were hauled down to the town of Errol, on the Androscoggin River, in that State, to be transported from thence upon the river to Lewiston, Maine ; and waited at Errol for a convenient opportunity for such transportation : *Held,* That they were still part of the general mass of property of the State, liable to taxation, if taxed in the usual way in which such property is taxed in the State.

In September, 1881, Edward S. Coe filed a petition in the Supreme Court of New Hampshire for the county of Coös, against the Town of Errol, for an abatement of taxes, and

therein, amongst other things, alleged that on the 1st of April, 1880, he and others, residents of Maine and Massachusetts, owned a large number of spruce logs that had been drawn down the winter before from Wentworth's location, in New Hampshire, and placed in Clear Stream and on the banks thereof, in the town of Errol, county of Coös, New Hampshire, to be from thence floated down the Androscoggin River to the State of Maine to be manufactured and sold; and that the selectmen of said Errol for that year appraised said logs for taxation at the price of $6000, and assessed thereon State, county, town, and school taxes, in the whole to the amount of $120, and highway taxes to the amount of $60. A further allegation made the same complaint with regard to a lot of spruce logs belonging to Coe and another person, which had been cut in the State of Maine, and were on their way of being floated to Lewiston, Maine, to be manufactured, but were detained in the town of Errol by low water. Similar allegations were made with regard to logs cut the following year, 1880, and drawn from Wentworth's location, and part of them deposited on lands of John Akers, and part on land of George C. Demeritt, in said town of Errol, to be from thence taken to the State of Maine; and, also, with regard to other logs cut in Maine and floated down to Errol on their passage to Lewiston, in the State of Maine, and both which classes of logs were taxed by the selectmen of Errol in the year 1881. The petition also contained the following allegations, to wit.:

"Said Coe further says that said logs of both years, so in the Androscoggin River, have each year been taxed as stock in trade in said Lewiston to said Coe and Pingree, and said Coe claims and represents that none of said logs were subject to taxation in said Errol for the reason that they were in transit to market from one State to another, and also because they had all been in other ways taxed.

"That said Androscoggin River, from its source to the outlet of the Umbagog Lake in the State of New Hampshire, through said State and through the State of Maine to said Lewiston, is now, and for a long time has been, to wit, for more than twenty years last past, a public highway for the

floatage of timber from said lakes and rivers in Maine, and from the upper waters of said Androscoggin River and its tributaries in New Hampshire down said river to said Lewiston, and has been thus used by the petitioner and his associates in the lumber business for more than twenty years last past."

Without further pleading, the parties made an agreed case, the important part of which was as follows, to wit:

"It is agreed that the facts set forth in the petition are all true except what is stated as to the taxation of the logs as stock in trade in Lewiston, Maine; and if that is regarded by the court as material, the case is to be discharged and stand for trial on that point. It is agreed that upon this petition the legality of the taxation is intended to be brought before the court for adjudication, and all formal objections to the proceedings in the town meeting, &c., and all other matters of form, are waived, and we submit the matter to the court for a legal adjudication as to whether or not any or all of the taxes shall be abated.

"And it is agreed that for many years the petitioner and his associates in the lumber business have cut large quantities of timber on their lands in Maine and floated them down the said lakes and rivers in Maine and down the Androscoggin River to the mills at said Lewiston; and timber thus cut has always lain over one season, being about a year, in the Androscoggin River, in this State, either in Errol, Dummer, or Milan; and the timber referred to in this petition as having been cut in Maine had lain over in Errol since the spring or summer before the taxation, according to the above custom."

Upon this case the Supreme Court of New Hampshire, in September term, 1882, adjudged as follows, to wit: "Now, at this term, the said questions of law having been fully determined in said law term; and an order made that that portion of said tax assessed upon the logs cut as aforesaid in said State of Maine be abated, and that the tax assessed upon all of said logs cut in the State of New Hampshire be sustained, and said order having been fully made known to the parties of this case and become a part of the record thereof, it is therefore ordered and decreed by the court that there be judgment in

accordance with said order made at said law term, without costs to either party."

The petitioner took a bill of exceptions, setting forth the agreed case, and stating, amongst other things, the points raised on the hearing befo the Supreme Court of New Hampshire, and the decision of that court thereon, as follows:

"On said hearing the petitioner claimed that said taxes named in the petition and the statutes of this State, under the provisions of which said taxes were assessed, were illegal and void, because said taxes were assessed in violation of, and said statutes of this State are in violation of and repugnant to, the general provisions of the Constitution of the United States; because said taxes were assessed in violation of, and said statutes of this State are in violation of and repugnant to, that part of section 2, art. 4, of the Constitution of the United States, which provides that 'The citizens of each State shall be entitled to all the privileges and immunities of citizens of the several States;' because said taxes were assessed in violation of, and said statutes of this State are in violation of and repugnant to, those parts of sec. 8 of art. 1 of the Constitution of the United States which provide that 'The Congress shall have power . . . to regulate commerce with foreign nations, and among the several States,' and section 10 of said article 1, which provides that 'No State shall, without the consent of Congress, lay any imposts or duties on imports or exports except what may be absolutely necessary for executing its inspection laws.'"

*Mr. Henry Heywood* for plaintiff in error.

The legal *situs* of this property, for the purposes of taxation, is not in the town or place where the property, thus in transit, happens to be on the first day of April or other date of taxation. *Conley* v. *Chedic,* 7 Nev. 336 ; *Parker Mills* v. *Tax Commissioners,* 23 N. Y. 242, 245; *Ellsworth* v. *Brown,* 53 Maine, 519; *Campbell* v. *Machias,* 33 Maine, 419. By the statute of Maine, the logs taxed in Errol, were subject to taxation at Lewiston, where the owners occupied a mill and one of them resided. For the purposes of taxation Lewiston was the legal

*situs* of this personal property. *Desmond* v. *Machias*, 48 Maine, 478. Revised Statutes of Maine, 1871, 131 §§ 13 and 14, as amended by ch. 182, laws of 1877. To sustain a taxation of the same property in New Hampshire must lead to double taxation and the statute attempting to authorize such taxation is in conflict with the Constitution of New Hampshire. Opinion of the Justices, 4 N. H. 565.

The resident owner of personal property in the State of New Hampshire has the right to use the public rivers of the State for the purposes of navigation without subjecting his property to the burden of double taxation. It is the privilege of the citizens of each State to use the public rivers and highways of the State for the purposes of transporting himself or property; and the like privilege or right is secured by, the Federal Constitution to citizens of the other States upon equal terms. Article 4, section 2. To hold that the property of a citizen of Maine in transit through New Hampshire upon one of our public watercourses and legally liable to taxation in Maine, is also liable to taxation in New Hampshire, would not be according to the citizen of Maine the privilege of the citizen of New Hampshire, and the State statute attempting to authorize such taxation of the property of the citizen of Maine is to that extent in violation of the provision of the Federal Constitution just cited. *Oliver* v. *Washington Mills*, 11 Allen, 268. In *Crandall* v. *Nevada*, 6 Wall. 35, a State law assessing a tax on passengers through the State was held void. For the same reasons given in that case the citizen of another State has the right to transport his property from or through the State of New Hampshire upon its public highways by land or water without subjecting it to taxation in New Hampshire. *Brown* v. *Maryland*, 12 Wheat. 419; *Ward* v. *Maryland*, 12 Wall. 418; *Paul* v. *Virginia*, 8 Wall. 168; *Guy* v. *Baltimore*, 100 U. S. 434, 439.

We further claim that any taxation under the laws of any of the States of this property, at the time of the taxation being the subject of inter-state commerce, is in violation of the provisions of article 12, section 8, par. 3 of the United States Constitution, and of section 10, par. 2. It has uniformly

been held by the Supreme Court of the United States that a
tax assessed under a State law, upon property being in transit
through the State, or from a point in the State to another State,
is in violation of these last provisions of the United States Con-
stitution, or rather as we understand it, in violation of the above
cited provision giving Congress power " to regulate commerce
    .   .   .    among the several states." *Case of the State Freight
Tax*, 15 Wall. 232; *Almy* v. *California*, 24 How. 169; *Wood-
ruff* v. *Parham*, 8 Wall. 123; *Steamship Co.* v. *Port Wardens*,
6 Wall. 31; *Welton* v. *Missouri*, 91 U. S. 275; *Railroad Co.* v.
*Husen*, 95 U. S. 465; *Cook* v. *Pennsylvania*, 97 U. S. 5C3.
Wherever the subjects, in regard to which a power to regulate
commerce is asserted, are in their nature national or admit of
one uniform system or plan of regulation, they are exclusively
within the regulating control of Congress. Transportation of
merchandise through a State or from one State to another
is of this nature. *State Freight Tax*, 15 Wall. 232; *Hall* v.
*DeCuir*, 95 U. S. 485. " The power to regulate commerce among
the several states was vested in Congress, in order to secure
equality and freedom in commercial intercourse against dis-
criminating state Legislation." Field, J., in *Railroad Co.* v.
*Richmond*, 19 Wall. 584, 589; *Welton* v. *Missouri*, above cited;
*Webber* v. *Virginia*, 103 U. S. 344. The non-exercise by
Congress of its power to regulate commerce among the States,
is equivalent to a declaration by that body that such commerce
shall be free from any restriction. *Welton* v. *Missouri*, 91 U. S.
275.

It will be said that these taxes, as is said by Blodgett, J., in
the opinion in this case in the State court, is no attempt to
regulate commerce upon the Androscoggin River passing from
New Hampshire into Maine, and the like in relation to the
Connecticut and other large rivers in the State, but is a tax
upon property in fact located within the State and legally
taxable there. The answer to this position is the practical
effect of taxes assessed under State laws upon property thus
situated. Admit the power of the State to assess taxes upon
property in transit between the States, and inter-state com-
merce will be regulated by State taxation irrespective of any

laws or regulations Congress can devise for that purpose, under the power given by the constitutional provision just cited. This position has always been taken to sustain State taxation, and has been answered by the Supreme Court substantially in the same way: Mr. Justice Strong in the case of the *State Freight Tax*, 15 Wall. 272, says: "It has repeatedly been held that the constitutionality or unconstitutionality of a state tax is to be determined, not by the form or agency through which it is to be collected, but by the subject upon which the burden is laid. The same has been decided in the following cases: *Bank of Commerce* v. *New York*, 2 Black, 620; *The Bank Tax Case*, 2 Wall. 200; *Society for Savings* v. *Coite*, 6 Wall. 594; *Provident Institution* v. *Massachusetts*, 6 Wall. 611; *Brown* v. *Maryland*, 12 Wheat. 419; *Henderson* v. *New York*, 92 U. S. 259. See also *State* v. *Eagle*, 34 N. J. L. 425; and *Currier* v. *Gordon*, 21 Ohio St. 605.

The facts show that the property was in transit. At the date of the taxation the logs were the subject of inter-state commerce. A temporary delay on the way did not terminate the transit. The property is all the time, while in motion or at rest, in transit, and is during the whole time of its transit the subject of inter-state commerce. Just as much so as the logs that come from Maine, or as these Wentworth Location logs would have been had they started from that location just prior to the first day of April and had passed through the town of Errol on the spring freshet on the first day of April.

It has been recently decided by the Supreme Court of New Hampshire that the petition for abatement given by the statute is the only relief the property owner has in that State against an illegal assessment, which is not fraudulently made. *Edes* v. *Boardman*, 58 N. H. 580. And in our case we were denied the right to an abatement of the taxes upon the ground that the assessment was not in any manner in violation of any provision of the United States Constitution. So it cannot be said that this is not a proceeding to which we are entitled to a writ of error to this court.

*Mr. S. R. Bond* for defendant in error.

MR. JUSTICE BRADLEY delivered the opinion of the court. After stating the facts in the language above reported he continued:

The case is now before us for consideration upon writ of error to the Supreme Court of New Hampshire, and the same points that were urged before that court are set up here as grounds of error.

The question for us to consider, therefore, is, whether the products of a State (in this case timber cut in its forests) are liable to be taxed like other property within the State, though intended for exportation to another State, and partially prepared for that purpose by being deposited at a place of shipment, such products being owned by persons residing in another State.

We have no difficulty in disposing of the last condition of the question, namely, the fact (if it be a fact) that the property was owned by persons residing in another State; for, if not exempt from taxation for other reasons, it cannot be exempt by reason of being owned by non-residents of the State. We take it to be a point settled beyond all contradiction or question, that a State has jurisdiction of all persons and things within its territory which do not belong to some other jurisdiction, such as the representatives of foreign governments, with their houses and effects, and property belonging to or in the use of the government of the United States. If the owner of personal property within a State resides in another State which taxes him for that property as part of his general estate attached to his person, this action of the latter State does not in the least affect the right of the State in which the property is situated to tax it also. It is hardly necessary to cite authorities on a point so elementary. The fact, therefore, that the owners of the logs in question were taxed for their value in Maine as a part of then general stock in trade, if such fact were proved, could have no influence in the decision of the case, and may be laid out of view.

We recur, then, to a consideration of the question freed from this limitation: Are the products of a State, though intended for exportation to another State, and partially prepared for

that purpose by being deposited at a place or port of shipment within the State, liable to be taxed like other property within the State?

Do the owner's state of mind in relation to the goods, that is, his intent to export them, and his partial preparation to do so, exempt them from taxation? This is the precise question for solution.

This question does not present the predicament of goods in course of transportation through a State, though detained for a time within the State by low water or other causes of delay, as was the case of the logs cut in the State of Maine, the tax on which was abated by the Supreme Court of New Hampshire. Such goods are already in the course of commercial transportation, and are clearly under the protection of the Constitution. And so, we think, would the goods in question be when actually started in the course of transportation to another State, or delivered to a carrier for such transportation. There must be a point of time when they cease to be governed exclusively by the domestic law and begin to be governed and protected by the national law of commercial regulation, and that moment seems to us to be a legitimate one for this purpose, in which they commence their final movement for transportation from the State of their origin to that of their destination. When the products of the farm or the forest are collected and brought in from the surrounding country to a town or station serving as an entrepôt for that particular region, whether on a river or a line of railroad, such products are not yet exports, nor are they in process of exportation, nor is exportation begun until they are committed to the common carrier for transportation out of the State to the State of their destination, or have started on their ultimate passage to that State. Until then it is reasonable to regard them as not only within the State of their origin, but as a part of the general mass of property of that State, subject to its jurisdiction, and liable to taxation there. if not taxed by reason of their being intended for exportation, but taxed without any discrimination, in the usual way and manner in which such property is taxed in the State.

Of course they cannot be taxed *as* exports; that is to say,

they cannot be taxed by reason or because of their exportation or intended exportation; for that would amount to laying a duty on exports, and would be a plain infraction of the Constitution, which prohibits any State, without the consent of Congress, from laying any imposts or duties on imports or exports; and, although it has been decided, *Woodruff* v. *Parham*, 8 Wall. 123, that this clause relates to imports from, and exports to, foreign countries, yet when such imposts or duties are laid on imports or exports from one State to another, it cannot be doubted that such an imposition would be a regulation of commerce among the States, and, therefore, void as an invasion of the exclusive power of Congress. See *Walling* v. *Michigan*, *ante*, 446, decided at the present term, and cases cited in the opinion in that case. But if such goods are not taxed as exports, nor by reason of their exportation, or intended exportation, but are taxed as part of the general mass of property in the State, at the regular period of assessment for such property and in the usual manner, they not being in course of transportation at the time, is there any valid reason why they should not be taxed? Though intended for exportation, they may never be exported; the owner has a perfect right to change his mind; and until actually put in motion, for some place out of the State, or committed to the custody of a carrier for transportation to such place, why may they not be regarded as still remaining a part of the general mass of property in the State? If assessed in an exceptional time or manner, because of their anticipated departure, they might well be considered as taxed by reason of their exportation or intended exportation; but if assessed in the usual way, when not under motion or shipment, we do not see why the assessment may not be valid and binding.

The point of time when State jurisdiction over the commodities of commerce begins and ends is not an easy matter to designate or define, and yet it is highly important, both to the shipper and to the State, that it should be clearly defined so as to avoid all ambiguity or question. In regard to imports from foreign countries, it was settled in the case of *Brown* v. *Maryland*, 12 Wheat. 419, that the State cannot impose any tax or duty on

such goods so long as they remain the property of the importer, and continue in the original form or packages in which they were imported; the right to sell without any restriction imposed by the State being a necessary incident of the right to import without such restriction. This rule was deemed to be the necessary result of the prohibitory clause of the Constitution, which declares that no State shall lay any imposts or duties on imports or exports. The law of Maryland, which was held to be repugnant to this clause, required the payment of a license tax by all importers before they were permitted to sell their goods. This law was also considered to be an infringement of the clause which gives to Congress the power to regulate commerce. This court, as before stated, has since held that goods transported from one State to another are not imports or exports within the meaning of the prohibitory clauses before referred to; and it has also held that such goods, having arrived at their place of destination, may be taxed in the State to which they are carried, if taxed in the same manner as other goods are taxed, and not by reason of their being brought into the State from another State, nor subjected in any way to unfavorable discrimination. *Woodruff* v. *Parham*, 8 Wall. 123; *Brown* v. *Houston*, 114 U. S. 622.

But no definite rule has been adopted with regard to the point of time at which the taxing power of the State ceases as to goods exported to a foreign country or to another State. What we have already said, however, in relation to the products of a State intended for exportation to another State will indicate the view which seems to us the sound one on that subject, namely, that such goods do not cease to be part of the general mass of property in the State, subject, as such, to its jurisdiction, and to taxation in the usual way, until they have been shipped, or entered with a common carrier for transportation to another State, or have been started upon such transportation in a continuous route or journey. We think that this must be the true rule on the subject. It seems to us untenable to hold that a crop or a herd is exempt from taxation merely because it is, by its owner, intended for exportation. If such were the rule in many States there would be nothing but the lands and real

estate to bear the taxes. Some of the Western States produce very little except wheat and corn, most of which is intended for export; and so of cotton in the Southern States. Certainly, as long as these products are on the lands which produce them, they are part of the general property of the State. And so we think they continue to be until they have entered upon their final journey for leaving the State and going into another State. It is true, it was said in the case of *The Daniel Ball*, 10 Wall, 557, 565: "Whenever a commodity has begun to move as an article of trade from one State to another, commerce in that commodity between the States has commenced." But this movement does not begin until the articles have been shipped or started for transportation from the one State to the other. The carrying of them in carts or other vehicles, or even floating them, to the depôt where the journey is to commence is no part of that journey. That is all preliminary work, performed for the purpose of putting the property in a state of preparation and readiness for transportation. Until actually launched on its way to another State, or committed to a common carrier for transportation to such State, its destination is not fixed and certain. It may be sold or otherwise disposed of within the State, and never put in course of transportation out of the State. Carrying it from the farm, or the forest, to the depôt, is only an interior movement of the property, entirely within the State, for the purpose, it is true, but only for the purpose, of putting it into a course of exportation; it is no part of the exportation itself. Until shipped or started on its final journey out of the State its exportation is a matter altogether *in fieri*, and not at all a fixed and certain thing.

The application of these principles to the present case is obvious. The logs which were taxed, and the tax on which was not abated by the Supreme Court of New Hampshire, had not, when so taxed, been shipped or started on their final voyage or journey to the State of Maine. They had only been drawn down from Wentworth's location to Errol, the place from which they were to be transported to Lewiston in the State of Maine. There they were to remain until it should be convenient to send them to their destination. They come precisely within

the character of property which, according to the principles herein laid down, is taxable. But granting all this, it may still be pertinently asked, How can property thus situated, to wit, deposited or stored at the place of entrepôt for future exportation, be taxed in the regular way as part of the property of the State? The answer is plain. It can be taxed as all other property is taxed, in the place where it is found, if taxed, or assessed for taxation, in the usual manner in which such property is taxed; and not singled out to be assessed by itself in an unusual and exceptional manner because of its destination. If thus taxed, in the usual way that other similar property is taxed, and at the same rate, and subject to like conditions and regulations, the tax is valid. In other words, the right to tax the property being founded on the hypothesis that it is still a part of the general mass of property in the State, it must be treated in all respects as other property of the same kind is treated.

These conditions we understand to have been complied with in the present case. At all events there is no evidence to show that the taxes were not imposed in the regular and ordinary way. As the presumption, so far as mode and manner are concerned, is always in favor of, and not against, official acts, the want of evidence to the contrary must be regarded as evidence in favor of the regularity of the assessment in this case.

The judgment of the Supreme Court of New Hampshire is

*Affirmed.*