## NATIONAL LABOR RELATIONS BOARD v. SANTA CRUZ FRUIT PACKING CO.

### No. 8432.

Circuit Court of Appeals, Ninth Circuit.

July 31, 1937.

Charles Fahy, Gen. Counsel, Robert B. Watts, Associate Gen. Counsel, Jerome I. Macht, Joseph Rosenfarb, A. Norman Somers, and Philip Levy, Attys., Nat. Labor Relations Board, all of Washington, D. C., for petitioner.

J. Paul St. Sure and E. H. Moore, both of Oakland, Cal., for respondent.

Before WILBUR, DENMAN, and HANEY, Circuit Judges.

DENMAN, Circuit Judge.

The National Labor Relations Board by its orders of April 2, 1936, required the respondent to "Cease and desist:

"(a) From discouraging membership in Weighers, Warehousemen and Cereal Workers, Local 38-44, International Longshoremen's Association, or in any other labor organization of its employees, by discharging or threatening to discharge any of its employees for joining Weighers, Warehousemen and Cereal Workers, Local 38-44, International Longshoremen's Association, or any other labor organization of its employees; and

"(b) From in any other manner discriminating against any of its employees in regard to hire or tenure of employment or any term or condition of employment for joining Weighers, Warehousemen and Cer-

eal Workers, Local 38-44, International Longshoremen's Association, or any other labor organization of its employees; and

"(c) From in any other manner interfering with, restraining, or coercing its employees in the exercise of their rights of self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the National Labor Relations Act [29 U.S.C.A. § 157],"

and to take affirmative action, which the Board finds "will effectuate the policies of the Act," (a) to offer to several discharged employees "immediate and full reinstatement, respectively, to their former positions, without prejudice to any rights and privileges previously enjoyed"; and (b) to make whole said discharged employees "for any loss of pay they have suffered by reason of their discharge by payment to each of them, respectively, of a sum of money equal to that which each would normally have earned as wages during the period from the date of his discharge to the date of such offer of reinstatement, computed at the wage rate each was paid at the time of his discharge, less the amount earned subsequent to his discharge"; and to "post immediately notices to its employees in conspicuous places in its various offices, stating (1) that respondent will cease and desist in the manner aforesaid, and (2) that such notices will remain posted for a period of at least thirty (30) consecutive days from the date of posting."

The Board has filed its petition in this court for the enforcement of the orders. Respondent Packing Company appears and contests the enforcement.

The respondent admits it is engaged in the canning and packing of fruits and vegetables, 39 per cent. of which are processed to be sold to persons in other states and foreign countries and shipped to them there. Its total pack in 1935 was in excess of 1,600,-000 cases. It consisted of tomatoes and tomato products, peaches, apricots, spinach, pears, asparagus, and pork and beans, in volume, in the order named.

The respondent, relying solely on the unconstitutionality of the Labor Relations Act (29 U.S.C.A. §§ 151-166) and the proceedings of the Board, does not question that the employees were dismissed by it because some of them had engaged in the

formation of the local of the union in question and all had joined it. Upon the lockout, the local caused the Oakland plant to be picketed. Violence ensued, causing hospitalization of some of the participants. The product of the plant was declared "hot" and other locals of unions—teamsters, dock clerks, scalers, seamen, and longshoremen— failed or refused to handle it. Blacklisting of respondent's products was attempted.

The Board found that the "bulk of" the agricultural products processed by the respondent came from the State of California, and the respondent contends, and we accept the contention, that substantially all of the products were produced by growers in the state. Respondent further contends, and we agree with the contention for the purposes of this decision, that the processing of the respondent, including the loading of its product in cars, is an intrastate activity as that is held to be in the Coe v. Errol Case, 116 U.S. 517, 518, 525, 6 S.Ct. 475, 29 L.Ed. 715.

The contention also was raised that under the agreements for the sale of the products, title was transferred to the purchaser prior to the actual entry of the goods into carriage by an interstate carrier, which contention we also accept for the purposes of this decision.

It appears that the respondent had two plants; one at Oakland, California, known as the "Santa Cruz plant," and one at Seabright, near Santa Cruz, Cal. The case as presented here concerns only the employees engaged at the Oakland plant and there is no showing that any of the products of the Seabright plant ever left the State of California.

We hold that so far as concerns the manufacture and shipping activities of the respondent and its employees at the Oakland plant, the labor dispute leading to the discharge of the employees, the declaration of the products as "hot," and the sympathetic refusal of other unions to handle them, "throttled" the flow of interstate commerce and "put in jeopardy" its future flow, to the extent of the 39 per cent. of respondent's products manufactured to be shipped into that commerce.

The respondent relies on the decisions of Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160; United Mine Workers v. Coronado Coal Co., 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975, 27 A.L.R. 762; Oliver Iron Mining Co. v. Lord, 262 U.S. 172, 43 S.Ct. 526, 67 L.Ed. 929; and others holding that manufacture, lumbering, and mining processes, including the loading on to the cars of the product, and all activities up to actual movement out of the state, as in the Coe Case, constitute intrastate production. Hence, the respondent contends, the Labor Relations Act is an attempt by the Congress to control the labor relations in such an intrastate activity and violates the provisions of the Tenth Amendment to the Constitution.

The questions for our solution are:

(1) Is the Carter v. Carter Coal Co. decision overruled by the decision of the Supreme Court in National Labor Relations Board v. Jones & Laughlin Steel Corporation, 57 S.Ct. 615, 81 L.Ed. ——, 108 A.L.R. 1352, so far as the former holds that the Constitution gives no power to the Congress to regulate intrastate production and manufacture of goods with respect to its labor disputes, which diminish or throttle the flow of goods intended to be and which would be shipped into interstate commerce?

(2) Granting the Congress has such power, can it be exercised where 39 per cent. of the goods produced by the labor employed are shipped in interstate commerce and 61 per cent. remain within the state of manufacture?

(1) *Carter v. Carter Coal Co. and similar cases are overruled by National Labor Relations Board v. Jones & Laughlin Steel Corporation.*

Respondent's contention that the Carter Case is not overruled by the Jones & Laughlin decision is squarely presented to this court and it would be an evasion of our judicial obligation to deny it a full consideration or attempt to evade it by asserting that it is here "not controlling."

Three circuits, the Second, Fifth, and Sixth, relied upon the principle established in the Carter Case in holding that the National Labor Relations Act was unconstitutional. National Labor Relations Board v. Friedman-Harry Marks Clothing Co. (C.C. A.2) 85 F.(2d) 1, 2; National Labor Relations Board v. Jones & Laughlin Steel Corp. (C.C.A.5) 83 F.(2d) 998, 999; Fruehauf Trailer Co. v. National Labor Relations Board (C.C.A.6) 85 F.(2d) 391, 392.

In all three of these cases there was an antecedent import of raw materials entering into the production, over which the Labor Relations Board asserted the right to regulate the employer and employee. Here, the respondent asserts, is a case identical with the Carter Coal Case, in what, it in-

sists, is the controlling fact that, as in mining coal, both the fruit and vegetables and the canned and packed product are produced in the state.

It is patent that the Carter case is identical in fact and relevant principle with that of respondent.

Unless overruled it clearly is controlling in so far as it denies the constitutional right of the Congress to regulate labor disputes affecting substantially the volume of a manufacturer's output which is "to be" transported in interstate commerce and which may be throttled from that transport and ultimate sale in another state unless so regulated.

Great stress is laid on the fact that the Congress has not before exercised such a power over labor relations in production of goods to be transported into interstate commerce. It is argued that if it may regulate labor disputes because it will affect the volume of goods to be transported in interstate commerce, it may regulate the volume itself of, say, shoes or clothing or furniture or food products, or the material used in the construction of housing, produced for use in other states. It is urged that all such production generally has been conceived as a matter of state control, and there are pointed out dangers of political control of such matters by bureaus in Washington. It is suggested that the Constitution was framed to meet a pioneer agricultural economy in which nearly everything consumed was grown or made on the farms or in the neighboring towns. Hence it is further urged that the framers of the Constitution never would have lodged in the Congress its powers over interstate commerce if it had envisioned an economy in which practically all the clothing we judges wear, every object contained in the chambers in which we sit, and the major part of the material entering the construction of the building in which the court is housed, come from some state other than California.

■ The answer to these contentions we have made in our decision in Edwards v. U. S., 91 F.(2d) 767, decided by this court on July 22, 1937. It is that the Carter Case is overruled by the Jones & Laughlin decision; that the Constitution did give the Congress the power so to regulate interstate commerce; and that that power is plenary as to all productive activities which substantially affect or tend to throttle the volume of goods to be transported in commerce outside the state of production.

Conventional historic attitudes towards states' rights are highly important in the political world when faced with the practicability of novel proposals of the exercise of congressional power. It may or may not be politically wise at any particular time for the Congress to proceed with caution, but this in no way concerns the judicial question of the extent of the power. To refrain from or to hesitate in decision when the question is fairly presented well may cause the paralysis and frustration of efficient legislative and executive action.

The reasoning and holding of the Edwards Case, supra, answers in the negative the first of respondent's contentions.

*(2) The specific constitutional grant of power to the Congress by article 1, section 8, to regulate commerce among the states and with foreign nations is paramount to the exercise by the states of the power of regulation of the intermingled intrastate commerce, included in the general reservation of state powers by the Tenth Amendment.*

*Hence, if any substantial percentage of a product produced in a state is produced to enter interstate or foreign commerce, the Congress may regulate its production, in so far as it affects the volume to enter such commerce, though such regulation also regulates a larger percentage of product which does not leave the state.*

■ Section 8 of article 1 of the Constitution makes a specific grant of power over interstate commerce. The Tenth Amendment is a general reservation of all powers not granted. There is no limit placed on the grant, no proviso that because the states also have exercised certain powers over manufacture and other production, the Congress is to be in any way hampered in the full exercise of its regulation. The Supreme Court has repeatedly held the contrary.

Construing the general reservation of state powers by the Tenth Amendment, as affected by the specific grant of power to regulate interstate commerce of article first, § 8, of the Constitution, the Supreme Court held: "This reservation to the states manifestly is only of that authority which is consistent with, and not opposed to, the grant to Congress. There is no room in our scheme of government for the assertion of state power in hostility to the authorized exercise of Federal power. The authority of Congress extends to every part of interstate commerce, and to every instrumentality or agency by which it is carried on; and

794

the full control by Congress of the subjects committed to its regulation is not to be denied or thwarted by the commingling of interstate and intrastate operations. This is not to say that the nation may deal with the internal concerns of the state, as such, but that the execution by Congress of its constitutional power to regulate interstate commerce is not limited by the fact that intrastate transactions may have become so interwoven therewith that the effective government of the former incidentally controls the latter. This conclusion necessarily results from the supremacy of the national power within its appointed sphere." The Minnesota Rate Case (Simpson v. Shepard), 230 U.S. 352, 399, 33 S.Ct. 729, 739, 57 L.Ed. 1511, 48 L.R.A.(N.S.) 1151, Ann.Cas.1916A, 18.

The Jones & Laughlin Case holds that the disorganization and disturbance of labor affecting interstate commerce does not have to be of railway employees to bring it within the control of Congress. The interference as well may come from labor conditions in the intrastate business entirely different from transportation.

"The opinion in that case [Virginian Ry. Co. v. System Federation, 57 S.Ct. 592, 81 L.Ed. 789] also points to the large measure of success of the labor policy embodied in the Railway Labor Act. But, with respect to the appropriateness of the recognition of self-organization and representation in the promotion of peace, the question is *not essentially different in the case of employees in industries of such a character that interstate commerce is put in jeopardy* from the case of employees of transportation companies. And of what avail is it to protect the facility of transportation, if interstate commerce is throttled with respect to the commodities to be transported." (Emphasis supplied.) National Labor Relations Board v. Jones & Laughlin Steel Corp., 57 S.Ct. 615, 627, 81 L.Ed. ——, 108 A.L.R. 1352.

The Shreveport Case (Houston, E. & W. T. R. Co.) 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341, relied upon by the Supreme Court for its decision in the Jones & Laughlin Case, holds that a company, by the rate charge of its intrastate business, may affect the rates of its interstate business in such a way that the intrastate business rate comes within congressional regulation. The fact that both of the businesses happen to be transportation is not relevant.

The analogy between the Shreveport Case and the Santa Cruz Fruit Packing Company is complete. In each the conduct of the intrastate business, the one as to its rates and the other as to its labor, affects the interstate business arising from the activities of the respective companies. In one this is accomplished by producing an *unfair rate* upon the commodities *"to be"* transported, and in the other by *throttling* the interstate business in the commodities *"to be"* transported. In both the intrastate business puts "in jeopardy" the proper and fair conduct of the commerce among the states. The acceptance by the Supreme Court of the doctrine of the Shreveport Case again demonstrates the overruling of the Carter Case.

The Shreveport Case does not determine the right of Congress to control the intrastate activity in rate making upon any ratio between the volume of business under the intrastate rates and under the interstate rates. In the Jones & Laughlin Case no significance is attached to the fact that 75 per cent. of the steel and other manufactured products entered interstate commerce, or that but 25 per cent. of intrastate manufacture was regulated.

■ Respondent is the fifth or sixth largest of the California companies processing and packing fruits and vegetables. The 39 per cent. of its business which enters into interstate commerce is a sufficiently substantial amount to warrant the Congress to make effective its regulation, even though thereby the 61 per cent. which is intrastate business is regulated with reference to labor disputes. The intermingling of the two activities does not take from the Congress the right to regulate that substantial portion over which the Constitution has specifically granted the control to the federal government.

■ The suggestion that we should make an academically arbitrary 50 per cent. as the boundary line between the two jurisdictions ignores the practical necessities of industry. Shall it be 50 per cent. in volume or price? What happens when for the first 6 months of the year 60 per cent. is exported and 40 per cent. is domestic, and for the rest of the year the percentages are reversed? Does the federal control end on June 30th? On which is the burden of proof, the state interest or the federal? How unfair may be the competition between the industry producing the 60 per cent. for export under federal regulation and its competitor with 40 per cent. under state regulation or no regulation at all!

Industry and business cannot thrive, in some cases it could not exist, in the uncertainty of such an abstract mathematical solution of the problem. It cannot be inferred that the Congress intended to create a situation so confusing alike to employer and employee.

What are the sufficient minima of producers' contributions to the flow of commerce to warrant congressional regulation must be decided as the questions arise. We have no doubt that the Santa Cruz Company's contribution, both as to volume added. to interstate and foreign commerce and percentage of its output, is "affecting commerce" within the meaning of the act.

We therefore hold that the Constitution granted to the Congress the power to regulate respondent's labor relations with reference to all of its employees at its Oakland plant engaged in the production of canned and packed fruits and vegetables, the processing of 39 per cent. of which was intended for interstate commerce and had been throttled for a considerable period from entering that commerce, although the remaining 61 per cent. remain within the state of production.

The Board's orders to cease and desist applied to all of the employees of the respondent, but the evidence shows no shipments by respondent into interstate commerce from its Seabright plant. The orders should be modified to apply only to the employees of the Oakland plant; otherwise they should be enforced.

The orders of the National Labor Relations Board, so modified with respect to confining their effect to the employees of the Oakland plant of the respondent, are ordered enforced.

HANEY, Circuit Judge (concurring).

I concur.

I believe Carter v. Carter Coal Co., 298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160, was in effect overruled by Nat. Labor Rel. Board v. Jones & Laughlin Steel Corp., 57 S.Ct. 615, 81 L.Ed. ——, 108 A.L.R. 1352, decided by the Supreme Court April 12, 1937, though it is true that no words are contained in the opinion in the latter case which indicates that the Carter Case was formally considered to be overruled. It is merely stated that the Carter Case is "not controlling."

What then is the controlling factor to be considered in connection with the jurisdiction of the Board? In the Jones Case, the Supreme Court quoted section 10(a) of the act, 29 U.S.C.A. § 160(a) conferring jurisdiction on the Board, and then stated: "The critical words of this provision, prescribing the limits of the Board's authority in dealing with the labor practices, are 'affecting commerce.'" The definition of "commerce" in section 2(6) of the act, 29 U.S.C.A. § 152(6) makes no attempt to define interstate or foreign commerce. The word "definition" as applied to commerce in said section is a misnomer in a sense. The only part thereof which may be called a definition, is the portion that restricts the broad meaning to "interstate and foreign commerce in the constitutional sense"; but the section makes no effort to determine or define such commerce in that sense. I am unable to find anything in the Jones Case which defines anew "interstate commerce." Were it necessary to make such a definition, I believe the inference which might properly be taken from the Jones Case is that anything which either starts or aids the flow of the stream is interstate or foreign commerce. As applied here, the beginning of the flow would be traceable to the planting of the seed. Successive stages would consist of the planting and growing, sale and delivery to respondent, the canning, the shipment in interstate commerce, and each step thereafter until the product reached the hands of the consumer and was consumed by him. Each step would be a part of the stream. Such an interpretation is what I believe to be the intent of the words as used in the Constitution.

However, I do not believe the Supreme Court made such a definition, because under its construction of the act, a new definition is unnecessary. The Board, by the act, is given jurisdiction over an unfair labor practice "affecting commerce" as defined in section 2(7), 29 U.S.C.A. § 152(7). The cases depend on this provision. The Supreme Court construed this provision, as follows: "This definition is one of exclusion as well as inclusion. The grant of authority to the Board does not purport to extend to the relationship beween all industrial employees and employers. Its terms do not impose collective bargaining upon all industry regardless of effects upon interstate or foreign commerce. It purports to reach only what may be deemed to burden or obstruct that commerce and, thus qualified, it must be construed as contemplating the exercise of control within constitutional bounds. It is a familiar principle that acts which directly burden or obstruct interstate or foreign commerce, or its free

flow, are within the reach of the congressional power. Acts having that effect are not rendered immune because they grow out of labor disputes. * * * *It is the effect upon commerce, not the source of the injury, which is the criterion.* * * * Whether or not particular action does affect commerce in such a close and intimate fashion as to be subject to federal control, and hence to lie within the authority conferred upon the Board, is left by the statute to be determined as individual cases arise." (Italics supplied.)

Thus it is quite plain that we are to consider only one thing, i. e., the effect of the unfair labor practice on interstate commerce. But it is pointed out in the Jones Case that the effect on interstate commerce, of the unfair labor practice, must be direct and immediate and not indirect and remote; the court saying: "Undoubtedly the scope of this power must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government. * * * The question is necessarily one of degree." The rule is like the ones relating to a state tax on an instrumentality of the federal government or on an instrumentality of interstate commerce, and a federal tax on an instrumentality of state government. I believe all of them are based on the modification of the rule in McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579, by Bank of New York v. Supervisors, 74 U.S. (7 Wall.) 26, 29, 19 L.Ed. 60, and in First National Bank of Louisville v. Commonwealth of Kentucky, 76 U.S. (9 Wall.) 353, 361, 19 L.Ed. 701. All of these rules, although theoretically sound, are unwise in a practical sense. No gauge has ever been made by which a given effect may be determined to be either direct or remote. As a result we have speculation and uncertainty. Compare the dissenting opinion in Brush v. Commissioner, 300 U.S. 352, 57 S.Ct. 495, 81 L.Ed. 691, 108 A.L.R. 1428, decided by the Supreme Court on March 15, 1937.

However, in the instant case applying that rule, it is plain to see that interstate commerce is obstructed, because production of goods was halted by the unfair labor practice. I do not believe that it is important whether 98 per cent. of respondent's production or only 1 per cent. of it, actually moved in interstate commerce. So long as 1 per cent. of the goods so moved, the unfair labor practice obstructed the movement to that extent. The effect would therefore be direct and immediate.

WILBUR, Circuit Judge (dissenting).

I dissent.

The Supreme Court having decided in National Labor Relations Board v. Jones & Laughlin Steel Corp., 57 S.Ct. 615, 81 L.Ed. —, 108 A.L.R. 1352, and in the companion cases (National Labor Relations Board v. Friedman-Harry Marks Clothing Co., 57 S.Ct. 645, 81 L.Ed. —, 108 A.L.R. 1352; National Labor Relations Board v. Fruehauf Trailer Co., 57 S.Ct. 642, 81 L.Ed. —, 108 A.L.R. 1352; Washington, Virginia & Maryland Coach Co. v. National Labor Relations Board, 57 S.Ct. 648, 81 L. Ed. —; Associated Press v. National Labor Relations Board, 57 S.Ct. 650, 81 L.Ed. —), that the regulatory power of Congress under the interstate commerce clause of the Constitution extends to the protection of the collective bargaining system between employer and employee in those industries whose products enter so largely into interstate commerce that a strike of the employees preventing production would directly affect interstate commerce, it is necessary to apply the principles enunciated in those cases to the case at bar.

In considering the interpretation of the Federal Constitution, it is quite true that the founders of our government did not realize the changes which would come by reason of the increased facilities for interstate communication and business such as the railroad, steamboat, airplane, telegraph, telephone, and radio. While these increased facilities have not changed the Constitution or its meaning, they have vastly extended its application. The framers of the Constitution probably never suspected that profanity whispered into a microphone in Portland, Ore., would be heard around the world and thus bring that subject under federal control. Duncan v. U.S. (C.C.A.) 48 F.(2d) 128. No one now questions the right of Congress to legislate concerning this vastly wider field. Laws regulating radio communication and airplane traffic have been accepted as a matter of course because they clearly relate to interstate commerce. The Constitution has not changed in that respect; it has not grown. It is interstate commerce which has grown. The activities of the people, however, in engaging in such interstate enterprises have brought them

under the regulatory power of Congress under the Federal Constitution.

In the Jones & Laughlin Case, supra, it is pointed out that when industries organize themselves on a national scale so that interstate commerce is a necessary factor of their activities, they are subject to regulatory power of Congress under the commerce clause of the Federal Constitution.

It is our duty to support the Constitution of the United States as interpreted by the Supreme Court. It is therefore of the utmost importance in this case to ascertain what the Supreme Court has decided with reference to the constitutionality and applicability of the Wagner Labor Relations Act (29 U.S.C.A. §§ 151–166) and to apply that conclusion to the factual situation presented in the case at bar.

The Supreme Court did not lay down any definite general rule upon the subject. It did hold, as to particular industries considered in the Jones & Laughlin Case and companion cases, that congressional power extended to the protection of collective bargaining in the plants of the employers there involved.

In the Jones & Laughlin Steel Corporation Case, supra, 75 per cent. of the product is shipped out of Pennsylvania. It is one of the four largest producers of steel in the United States. In the trailer case (National Labor Relations Board v. Fruehauf Trailer Co., 57 S.Ct. 642, 81 L.Ed. ——, 108 A.L.R. 1352, supra), 50 per cent. of the material used was imported from other states, 80 per cent. of the product was shipped outside the state. In the clothing case (National Labor Relations Board v. Friedman-Harry Marks Clothing Co., 57 S.Ct. 645, 81 L.Ed. ——, 108 A.L.R. 1352, supra), 99.57 per cent. of the goods came from other states, 75 per cent. being purchased in New York alone, 82.8 per cent. of the output purchased by customers outside the state.

None of these cases approximate the condition presented in the case at bar. All of them dealt with cases in which a large part of the raw material manufactured by the employers was imported into the state for the purpose of manufacture and was in fact exported from the state after manufacture. In the case at bar we have the defendant engaged in preparing homegrown products for the market knowing that according to its usual business 39 per cent. of that product would enter into interstate or foreign commerce. The grower who produces the fruit does not know what part of his fruit, if any, will enter into interstate commerce. He sells it to the respondent knowing, perhaps, that 39 per cent. of the product of the cannery will enter into foreign or interstate commerce. The cannery does not segregate its employees into groups, some working upon material to enter into interstate and foreign commerce, and others upon material to be sold in intrastate commerce. There is no segregation of the product at any time until after the cannery and warehousing operations are completed.

The decision of the Board is predicated upon the proposition that a strike might result if collective bargaining were denied and that if such a strike occurred it would directly affect interstate commerce by shutting off production. That decision, assuming jurisdiction over the respondent's entire Oakland and Seabright plants so far as collective bargaining is concerned, is not predicated upon any clear line distinguishing between the employees working in the plant as to the character of the work performed but is based on the theory that inasmuch as 39 per cent. of the product finds its way in interstate commerce a restriction of the output of the plant would diminish the amount of material entering into interstate commerce pro tanto. There is no evidence to support this conclusion other than the assumption that the business would be divided in the same way whether the amount of the product was great or small. None of the cases decided by the Supreme Court went as far as does this decision of the Board. Not only was most of the raw material of the employer in those cases imported from outside the state, but in each case more than 75 per cent. of the resulting product entered into interstate and foreign commerce. Here we have none of the products from outside the state and less than half the product entering interstate commerce. As the cases decided by the Supreme Court are not directly applicable because the facts differ, we turn to the reasoning by which the majority of the Supreme Court reached its conclusion to see if such reasoning is applicable or decisive herein.

Taken broadly the logic of this reasoning would justify the conclusion of my associates, but the majority of the Justices of the Supreme Court, as well as the minority, foresaw the danger that the opinion, pressed to its logical conclusion, might result in leaving to the sovereign states only the empty hull of government and admonished that in applying these decisions we must

not only consider as a factor in the problem the direct effect upon interstate commerce of the collective bargaining system, but must also consider as a factor the authority of the state over domestic concerns expressly and impliedly reserved by and to them by the Constitution. In that regard I quote from the opinion of the majority, written by the Chief Justice, as follows (57 S.Ct. 615, 624, 81 L.Ed. ——, 108 A.L.R. 1352): "Undoubtedly the scope of this power must be considered in the light of our dual system of government and may not be extended so as to embrace effects upon interstate commerce so indirect and remote that to embrace them, in view of our complex society, would effectually obliterate the distinction between what is national and what is local and create a completely centralized government. Id. The question is necessarily one of degree. As the Court said in Board of Trade of City of Chicago v. Olsen, supra, 262 U.S. 1, 37, 43 S.Ct. 470, 477, 67 L.Ed. 839, repeating what had been said in Stafford v. Wallace, supra [258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229]: 'Whatever amounts to more or less constant practice, and threatens to obstruct or unduly to burden the freedom of interstate commerce is within the regulatory power of Congress under the commerce clause, and it is primarily for Congress to consider and decide the fact of the danger and to meet it.'"

The minority of the court, upon this subject, say: "It is vital that the independence of the commercial power and of the police power, and the delimitation between them, however sometimes perplexing, should always be recognized and observed, for, while the one furnishes the strongest bond of union, the other is essential to the preservation of the autonomy of the states as required by our dual form of government; and acknowledged evils, however grave and urgent they may appear to be, had better be borne, than the risk be run, in the effort to suppress them, of more serious consequences by resort to expedients of even doubtful constitutionality."

This danger was pointed out by the Supreme Court in Kidd v. Pearson, 128 U.S. 1, 9 S.Ct. 6, 32 L.Ed. 346, cited by the minority of the Supreme Court in the dissenting opinion in the Jones & Laughlin Case. The court there said (57 S.Ct. 615, 638, 81 L.Ed. ——, 108 A.L.R. 1352): "'If it be held that the term (commerce with foreign nations and among the several states) includes the regulation of all such manufactures as are intended to be the subject of commercial transactions in the future, it is impossible to deny that it would also include all productive industries that contemplate the same thing. The result would be that congress would be invested, to the exclusion of the states, with the power to regulate, not only manufacture, but also agriculture, horticulture, stock-raising, domestic fisheries, mining,—in short, every branch of human industry.'"

Nearly a half century ago, in the case of Kidd v. Pearson, 128 U.S. 1, 9 S.Ct. 6, 10, 32 L.Ed. 346, supra, the Supreme Court held that a state could prohibit the manufacturing of intoxicating liquor within its borders notwithstanding such liquor was intended for transportation to other states, and was manufactured for that purpose. The court stated: "It is true that, notwithstanding its [the state prohibition statute] purposes and ends are restricted to the jurisdictional limits of the state of Iowa, and apply to transactions wholly internal and between its own citizens, its effects may reach beyond the state, by lessening the amount of intoxicating liquors exported. But it does not follow that, because the products of a domestic manufacture may ultimately become the subjects of interstate commerce, at the pleasure of the manufacturer, the legislation of the state respecting such manufacture is an attempted exercise of the power to regulate commerce exclusively conferred upon congress. Can it be said that a refusal of a state to allow articles to be manufactured within her borders (for export) any more directly or materially effects her external commerce than does her action in forbidding the retail within her borders of the same articles after they have left the hands of the importers?"

To this query the Supreme Court answered: "No." In answering the question the Supreme Court cited the earlier cases (the License Tax Cases, 5 Wall. 462, 470, 18 L.Ed. 497) decided seventy years ago, where it is said: "Over this commerce and trade [the internal commerce and domestic trade of the states] Congress has no power of regulation nor any direct control. This power belongs exclusively to the States. No interference by Congress with the business of citizens transacted within a State is warranted by the Constitution, except such as is strictly incidental to the exercise of powers clearly granted to the legislature.

The power to authorize a business within a State is plainly repugnant to the exclusive power of the State over the same subject."

This statement of elementary constitutional law was made arguendo in deciding that Congress could not authorize a business prohibited by the state and that its license tax did not operate to permit the licensee to conduct a business in a state which prohibited that business. It may well be that the recent decisions of the Supreme Court in the Wagner Act cases depart from this earlier rule in holding as they do that the volume of output of a local business entering into interstate commerce may become the subject of federal legislation because it directly affects interstate commerce, but the many decisions of the Supreme Court on the same subject must not be considered as completely brushed aside or disregarded or overruled by these recent decisions. Assuming, then, that the recent decisions extend the previous limits of federal power over local business because that business directly affects interstate commerce, the question in the case at bar is whether or not the conclusion of the petitioner that the ultimate destination of 39 per cent. of respondent's production in interstate and foreign commerce, subject to the regulatory power of Congress should control the other 61 per cent. of the production normally subject to state regulation, is a reasonable recognition of the right of the state government to control its domestic affairs. In considering the relative rights of the state and federal governments it should be remembered that after the Revolution full sovereignty was vested in each of the original states subject to minor control by Congress under the Articles of Confederation and that the federal government now has only such powers as were then granted to it by the states in the Constitution of 1787, and such as were granted by the amendments thereto. This, although historically clear, was made definite by the Tenth Amendment to the Constitution ratified in 1791 expressly reserving to the states, and to the people, all powers not given to the United States. Is it to be believed that full power would have been given to Congress over interstate and foreign commerce if it had been thought by those who formed the Constitution in 1787 and consented to its adoption at that time, that lying dormant within this general grant of power was a power to control practically every activity in a state if a small percentage of the product of this activity entered interstate or foreign commerce? The historical answer is clearly that such a provision so construed would not have been adopted.

In a sense we should view the case before us as if the parties involved were the state of California on the one hand, and the federal government on the other, each asserting jurisdiction over the parties to this action, and each asserting the right to regulate the relation of employer and employee here involved. Is it logical to say that the federal government should control a confessedly intrastate or domestic activity because 39 per cent. of its product is shipped out of the state, and to deny to the state government the power to regulate the industry or any part of it for that reason, although 61 per cent. of the product is consumed within the state? Was it the intention of the thirteen original states when they adopted the Constitution to grant such power to the federal government? As the Supreme Court has often declared, where interstate commerce is concerned the federal government is supreme by reason of the interstate commerce clause of the Constitution. This rule has been enunciated from the first, but in the instant case it is not asserted that the thing regulated is interstate commerce but merely something domestic—intrastate—which "directly affects" interstate commerce. So that we are concerned with an exercise of this corollary power rather than with the direct grant of power to Congress. Certainly in this broader and more nebulous field exercise of power by the federal government should give due recognition to the inherent right of the sovereign state to control its own domestic affairs. I cannot believe that where less than 50 per cent. of the manufactured product enters into interstate and foreign commerce the federal government is justified under the interstate commerce clause in seizing or exercising jurisdiction over the whole industry. The line must be drawn somewhere and it seems to me that it must at least be drawn so that control will reside in the sovereignty most affected by the action.

The Wagner Act does not expressly authorize any interference with the powers of the state nor define what constitutes direct interference with interstate or foreign commerce. If Congress had asserted jurisdiction over industries and activities wherein a certain percentage, say 50 per cent. or more, of its products, ultimately moved in

interstate or foreign commerce, the court would sustain the action of Congress if it had any reasonable doubt of the constitutionality of its action. In such a case the presumption that Congress had acted constitutionally would only be overborne where it was clear beyond a reasonable doubt that its action was not authorized by the Constitution. But in the Wagner Act Congress did not undertake to draw the line to which it attempted to extend its authority other than by the general assumption of power over foreign and interstate commerce and over collective bargaining between employer and employee directly affecting such commerce, leaving to the National Labor Relations Board in the first instance the determination of whether or not the establishment of collective bargaining directly affected interstate commerce in each particular case. The conclusion of the Board upon the factual situation is made conclusive upon the courts. But the question of constitutional interpretation is one for the court to be applied by it to the facts found by the National Labor Relations Board. The ultimate fact found by the Board is that 39 per cent. of the output of the respondent enters into interstate and foreign commerce, for it must be assumed as a matter of law under the decision of the Supreme Court in the Jones & Laughlin Steel Co. Case that as to such commerce the matter of collective bargaining directly affects it, and that Congress consequently has power to establish, protect, and maintain the right to collective bargaining. We may assume that if a line can be drawn between the employees engaged in producing goods for interstate and foreign commerce and those engaged in production for intrastate consumption, Congress would have legislative power over the former and the state over the latter; but we are concerned with a situation where no attempt has been made or could be made to segregate such employees, and where, because of that fact jurisdiction is asserted over all employees, thus in effect reversing the rule that federal power should clearly appear before its exercise is justified. We may agree, as the Supreme Court has decided, that control over a manufacturing plant may be asserted because a cessation of its activities on account of a strike would diminish the volume of interstate commerce, but to hold that the exercise of power extends to the intrastate products, and labor producing them, is to take another step away from the direct grant of power to Congress over interstate commerce in favor of federal power, which is not justified unless the federal interest preponderates.

Congress laid down no certain guide for the Board or the court in reaching its conclusions, and has provided that the action of the Board is ineffective until approved by the court. The question as to whether under the facts found by the Board there is a direct effect upon interstate commerce is one to be solved by the court without any guide other than the proposition advanced by the statute and sustained by the Supreme Court as a valid exercise of constitutional authority, namely, that collective bargaining is a matter for federal control where the employees are engaged in activity which directly affects interstate commerce. As a matter of cold logic it may be said that if the decrease in the volume of output of a factory decreases the volume of interstate commerce it pro tanto directly affects such commerce, whether the amount is 100 per cent. or one per cent. For in either case the Supreme Court has decided that the effect is direct, and that the constitutional power of Congress attaches thereto. But we are not dealing with an abstract problem of mathematics, but with one of the practical construction of the Federal Constitution concerning the relative rights of states of the United States and of the individuals concerned. As the line of state and federal authority must be drawn somewhere, I can see no other logical division than that of the line which determines which interest preponderates, foreign and interstate commerce on the one hand, or domestic or intrastate commerce on the other. Let it be granted that this conclusion is not entirely logical or satisfactory, nevertheless it seems to be the only escape from a legalistic formulae which, under the guise of regulating commerce between the states, virtually transfers to the federal government substantially all the power which pertains to state sovereignty and which have been traditionally exercised by each of them ever since the Constitution was adopted. This formula is not based upon the clear grant of power to Congress over interstate commerce, but upon what is held to be a necessary incident thereto. I recognize the logic and discernment of my associates in this case, but I cannot assent thereto because it proves entirely too much, and this because in my opinion it ignores a vital and essential element in the problem, that

is, the superior and dominant power of the state over its internal affairs. I therefore conclude that the application of the Board for an enforcement order in this case should be denied.

Thus far I have assumed, as my associates do, that the order of the Board relates to all the employees of the respondent. The cease and desist order quoted in the main opinion apparently applies to all the employees of the respondent but in the petitioner's brief it is emphasized that the order of the Board relates to employees engaged as warehousemen at the Oakland plant. The petitioners state in their brief that:

"Approximately 3,000 to 4,000 cases are loaded daily into the various vehicles of conveyance. The employees here involved are the warehousemen who do all of such loading. * * *

"Thus the employees here involved actually start all of the respondent's products upon the course of transportation to their ultimate destination. * * *

"In a concluding finding with respect to the nature of respondent's business and the duties of these employees the Board found that all of the aforesaid constitutes a continuous flow of trade, traffic and commerce among the several states, and with foreign countries; and that the warehousemen here involved are engaged in operations in the course and conduct of such commerce and are an integral part of such commerce. * * *

"It is to be noted that we are concerned here only with that phase of the respondent's business in which it is engaged in shipping its finished products to states outside of California and to foreign countries. We are not concerned with that phase of respondent's business in which the products are processed. The employees with whom we deal here are solely those who are engaged in actually packing, loading, and shipping respondent's finished products into box cars, trucks, and other interstate carriers destined for points in other states and in foreign countries. They are the employees who actually ship the respondent's finished products in interstate and foreign commerce. We do not deal here with the other employees who are engaged in processing the various raw materials of the respondent. Therefore, we do not consider in this brief the application of the National Labor Relations Act (29 U.S.C.A. §§ 151–166) to any other than shipping employees. * * *

"The activities of the respondent and the employees here involved are divorced from and are not affected by the other activities of the respondent. The respondent and its employees, insofar as the operations here involved are concerned, are directly engaged in interstate and foreign commerce and consequently are validly subject to congressional regulation under the Act. Gibbons v. Ogden, 9 Wheat. 1, 6 L.Ed. 23; Heyman v. Hays, 236 U.S. 178, 35 S.Ct. 403, 59 L.Ed. 527; Southern Operating Co. v. Hays, 236 U.S. 188, 35 S.Ct. 405, 59 L.Ed. 531; Sioux Remedy Co. v. Cope, 235 U.S. 197, 35 S.Ct. 57, 59 L.Ed. 193.

"The fact that the respondent is also engaged in the processing, production, or manufacture of canned goods does not divest its operations in selling and shipping its products to points outside of California of their interstate character."

"For the purpose of our Constitutional argument we are therefore justified in ignoring the fact that the respondent is engaged in processing or production, with which activities we are not here concerned."

In view of the fact that the petitioners in their brief limit the effect of their order to the warehousemen in the Oakland plant, I think the cease and desist order should be thus limited. However, this contention was advanced before the Supreme Court had sustained the validity of the Wagner Act as applied to intrastate activities which directly affect interstate commerce, and, consequently, the Board might not consider themselves now bound by the limitations which they thought advisable in presenting a constitutional question before the decision of the Supreme Court. My associates have dealt with the order of the Board as though it applied to all the operatives in the Oakland plant so far as the jurisdiction of the Board is concerned and so far as the order to cease and desist is concerned. I am inclined, however, to think that the Board's interpretation of its own order confining the effect thereof to those engaged in shipping respondent's product should be observed in our enforcement order.

In my opinion the application for the enforcement order should be denied, but if granted should be applied only to the employees of the respondent engaged in shipping at its Oakland plant.