### FLEMING, Administrator of Wage and Hour Division, v. PEOPLES PACKING CO., Inc.

### No. 801.

District Court, W. D. Oklahoma.

Jan. 21, 1942.

Llewellyn B. Duke, Regional Atty., and Robert W. Richards, Asst. Regional Atty., Wage and Hour Division, both of Dallas, Tex., for plaintiff.

James S. Twyford and Solon W. Smith, both of Oklahoma City, Okl., for defendant.

VAUGHT, District Judge.

This is an action instituted by the plaintiff as Administrator of the Wage and Hour Division, United States Department of Labor, to enjoin the defendant from violating the provisions of Sections 15(a) (1) and 15(a) (2) of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq.

■ The evidence discloses that the defendant is engaged in the slaughter and sale of livestock in Oklahoma City, Oklahoma. It purchases its animals for slaughter and sale, all within the state of Oklahoma. The slaughtering of the animals is conducted at its plant in Oklahoma City. The edible portion of the animals is prepared for market and sold entirely within the state of Oklahoma, and consists of in excess of 95 per cent. of the value of the carcasses. The inedible portion consists of the hides and the offal, and represents from 3 to 4 per cent. of the value of the carcasses, and approximately 45 per cent. of the weight of the carcasses. The hides are sold to a purchaser in Oklahoma City who, when he has accumulated and conditioned a carload, ships to points outside the state. The offal is purchased by a corporation in Oklahoma City, which reduces it to grease, tankage and waste, and sells the grease to soap manufacturers outside the state. The evidence is not clear as to what portion of the offal constitutes actual waste, but a court is not supposed to ignore actual knowledge which it possesses on matters which are not in controversy, and it is evident that that part of the offal which has no usable value, consists of at least 50 per cent. of the weight of the inedible portion.

The defendant employs from thirty to forty persons. From four to seven handle the killing, removal of the hides and the offal in connection with their other work in the plant. The hides and offal are sold immediately from the plant.

It is the contention of the plaintiff that, since the hides are sold to a purchaser in Oklahoma City, who in turn sells them to persons outside the state, and since the offal is sold to another corporation in Oklahoma City, which in turn processes same into grease and tankage and sells the grease to soap manufacturers outside the state, the defendant is engaged in interstate commerce.

The defendant contends that, since more than 95 per cent. of the value of the carcasses is sold and consumed within the state, and since the hides and offal of the value

of from 3 to 4 per cent. also are sold, wholly within the state, although the local purchasers of the hides and offal, after conditioning and processing, sell to purchasers outside the state, it is engaged in intrastate commerce and, therefore, the Act is not applicable.

Section 206, Title 29 U.S.C.A., provides that every employer shall pay to each of his employees who is "engaged in commerce or in the production of goods for commerce" wages at certain definite rates. Section 207, Title 29 U.S.C.A., provides that no employer shall, except as otherwise provided in that section, employ any of his employees who is "engaged in commerce or in the production of goods for commerce" for a work week longer than a certain definite number of hours.

"Commerce", as used in the foregoing sections, is defined in Section 203, Title 29 U.S.C.A., as follows: " 'Commerce' means trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof."

So the term "commerce", as used in the Act, means interstate commerce.

Section 213, Title 29 U.S.C.A., provides: "The provisions of sections 206 and 207 shall not apply with respect to * * * (2) any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce * * *."

It is apparent that the contention of the administrator is highly technical. It would be impossible for the defendant to slaughter its cattle and hogs and prepare the edible portion thereof for market without removing the hides and offal. In the early history of the industry the offal had little or no value and was usually hauled to the garbage dump or destroyed, and the hides had only nominal value. It is disclosed in this record that the value of the hides and offal, being that portion of the carcasses which is inedible, represents from 3 to 4 per cent. of the total value of the carcasses. Therefore, the removal of the hides and the offal from the edible portion of the animals is as much, or more, an act in connection with the preparation of the edible portion for market as it is an act in the salvaging of the inedible portion.

Furthermore, the employees do not manufacture the hides and the offal. They merely remove the inedible portion from the edible portion. They could not be producers of the inedible portion of the animals except as servicing and handling the hides and the offal make the employees producers under the provisions of the Act. The hides and offal, when sold, are in exactly the same condition they were before removal from the animals, except that they have been separated from the edible portion. The inedible portion is sold at the dock of the plant and it is admitted that the defendant had nothing more to do with the inedible portion after it left its dock.

The exemption clause, as quoted above, includes "any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce." This hardly could be called a retail establishment, but it is a servicing establishment, and in this servicing of the entire carcass more than 95 per cent. of the value is for use in intrastate commerce.

It requires the knowledge of an expert in surgical science to determine whether the inedible portion was removed from the edible portion of the carcass, or the edible portion removed from the inedible portion. But in either case, the entire carcass was serviced. If therefore the entire carcass was serviced in the acts above described, the servicing would be controlled by the exemption clause of the Act, in determining the applicability of the Act.

The sole power of Congress to regulate commerce of any character is found in Article I, Section 8 of the Constitution, as follows: "The Congress shall have power * * * To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes; * * *."

The first important case in which the Supreme Court of the United States construed this section of the Constitution is Gibbons v. Ogden, 9 Wheat. 1, 22 U.S. 1, 211, 6 L.Ed. 23, and in that famous opinion the court, referring to the right to engage in commerce between the states, said: "In pursuing this inquiry at the bar, it has been said, that the constitution does not confer the right of intercourse between state and state. That right derives its source from those laws whose authority is acknowledged by civilized man throughout the world. This is true. The constitution found it an existing right, and gave to congress the power to regulate it."

Certainly under this construction of the Constitution, the power to engage in

commerce and the right to engage in commerce were inherent. The sole power granted to Congress under this provision of the Constitution was to regulate the commerce between the states and with foreign nations. This same line of reasoning was approved in Brown v. Maryland, 12 Wheat. 419, 25 U.S. 419, 6 L.Ed. 678.

Prior to the adoption of the Constitution, the words "interstate and foreign commerce" were not recognized as words with legal significance.

■ The Constitution gave to Congress, and took from the states, the power to regulate interstate and foreign commerce and, therefore, the necessity for defining interstate and foreign commerce, as well as intrastate commerce, rests ultimately with the Supreme Court.

In Coe v. Errol, 116 U.S. 517, 6 S.Ct. 475, 477, 29 L.Ed. 715, the Supreme Court again had occasion to pass upon this question. The case grew out of a shipment of logs which were cut in New Hampshire for final shipment to Maine. According to custom, they remained in or near the river for a year or more, apparently for the purpose of seasoning. They were taxed while in that condition by the state of New Hampshire and it was held that the tax was valid, as the property was not actually in interstate commerce. The test laid down was when did "they commence their final movement for transportation from the state of their origin to that of their destination," and the court said:

"There must be a point of time when they cease to be governed exclusively by the domestic law, and begin to be governed and protected by the national law of commercial regulation, and that moment seems to us to be a legitimate one for this purpose, in which they commence their final movement for transportation from the state of their origin to that of their destination."

In Hammer v. Dagenhart, 247 U.S. 251, 272, 38 S.Ct. 529, 531, 62 L.Ed. 1101, 3 A.L.R. 649, Ann.Cas.1918E, 724, the court again addressed itself to this rule, and said:

"Over interstate transportation, or its incidents, the regulatory power of Congress is ample, but the production of articles, intended for interstate commerce, is a matter of local regulation.

" 'When the commerce begins is determined, not by the character of the commodity, nor by the intention of the owner to transfer it to another state for sale, nor by his preparation of it for transportation, but by its actual delivery to a common carrier for transportation, or the actual commencement of its transfer to another state.' Mr. Justice Jackson in Re Greene, C.C., 52 F. [104], 113. This principle has been recognized often in this court. Coe v. Errol, 116 U.S. 517, 6 S.Ct. 475, 29 L.Ed. 715; Bacon v. Illinois, 227 U.S. 504, 33 S.Ct. 299, 57 L. Ed. 615, and cases cited. If it were otherwise, all manufacture intended for interstate shipment would be brought under federal control to the practical exclusion of the authority of the states, a result certainly not contemplated by the framers of the Constitution when they vested in Congress the authority to regulate commerce among the States. Kidd v. Pearson, 128 U.S. 1, 21, 9 S.Ct. 6, 32 L.Ed. 346."

In Chassaniol v. City of Greenwood, 291 U.S. 584, 586, 54 S.Ct. 541, 542, 78 L.Ed. 1004, decided March 12, 1934, Mr. Justice Brandeis, speaking for the court said: "Chassaniol contends that all the cotton is in interstate or foreign commerce from the moment it leaves the gin for Greenwood, or at least from the moment it is purchased at Greenwood by the buyer. The argument is that already at that time the cotton is destined for ultimate shipment to some other state or country; and that to tax the occupation of the cotton buyer burdens interstate commerce, since the buyer at Greenwood is the instrumentality by which the interstate transaction is initiated. The business involved is substantially like that described in Federal Compress & Warehouse Co. v. McLean [291 U.S. 17, 54 S.Ct. 267, 78 L.Ed. 622]; and the rule there declared must govern here. Ginning cotton, transporting it to Greenwood, and warehousing, buying, and compressing it there, are each, like the growing of it, steps in preparation for the sale and shipment in interstate or foreign commerce. But each step prior to the sale and shipment is a transaction local to Mississippi, a transaction in intrastate commerce."

In Schechter Poultry Corp v. United States, 295 U.S. 495, 543, 55 S.Ct. 837, 849, 79 L.Ed. 1570, 97 A.L.R. 947, the same court had occasion to reaffirm the doctrine which had been recognized since 1824. The court there said:

"The mere fact that there may be a constant flow of commodities into a state does not mean that the flow continues after the property has arrived and has become commingled with the mass of property within

the state and is there held solely for local disposition and use. * * * Hence decisions which deal with a stream of interstate commerce—where goods come to rest within a state temporarily and are later to go forward in interstate commerce—and with the regulations of transactions involved in that practical continuity of movement, are not applicable here.

\* \* \* \* \*

"In determining how far the federal government may go in controlling intrastate transactions upon the ground that they 'affect' interstate commerce, there is a necessary and well-established distinction between direct and indirect effects. The precise line can be drawn only as individual cases arise, but the distinction is clear in principle.

\* \* \* \* \*

"It is not the province of the Court to consider the economic advantages or disadvantages of such a centralized system. It is sufficient to say that the Federal Constitution does not provide for it. Our growth and development have called for wide use of the commerce power of the federal government in its control over the expanded activities of interstate commerce and in protecting that commerce from burdens, interferences, and conspiracies to restrain and monopolize it. But the authority of the federal government may not be pushed to such an extreme as to destroy the distinction, which the commerce clause itself establishes, between commerce 'among the several States' and the internal concerns of a state. The same answer must be made to the contention that is based upon the serious economic situation which led to the passage of the Recovery Act [48 Stat. 195],—the fall in prices, the decline in wages and employment, and the curtailment of the market for commodities. Stress is laid upon the great importance of maintaining wage distributions which would provide the necessary stimulus in starting 'the cumulative forces making for expanding commercial activity.' Without in any way disparaging this motive, it is enough to say that the recuperative efforts of the federal government must be made in a manner consistent with the authority granted by the Constitution."

In National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 30, 57 S.Ct. 615, 621, 81 L.Ed. 893, 108 A.L.R. 1352, the Supreme Court approved the rule announced in the Schechter case, supra, and said:

"The authority of the federal government may not be *pushed to such an extreme as to destroy the distinction, which the commerce clause itself establishes, between commerce 'among the several States' and the internal concerns of a state.* That distinction between what is national and what is local in the activities of commerce is vital to the maintenance of our federal system. [Emphasis supplied.]

\* \* \* \* \*

"It is thus apparent that the fact that the employees here concerned were engaged in production is not determinative. The question remains as to the effect upon interstate commerce of the labor practice involved. In the Schechter case, supra, we found that the effect there was so remote as to be beyond the federal power. To find 'immediacy or directness' there was to find it 'almost everywhere,' a result inconsistent with the maintenance of our federal system."

In Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 466, 58 S.Ct. 656, 660, 82 L.Ed. 954, the court again said:

"It is also clear that where federal control is sought to be exercised over activities which separately considered are intrastate, it must appear that there is a close and substantial relation to interstate commerce in order to justify the federal intervention for its protection. However difficult in application, this principle is essential to the maintenance of our constitutional system. The subject of federal power is still 'commerce,' and not all commerce but commerce with foreign nations and among the several states. The expansion of enterprise has vastly increased the interests of interstate commerce, but the constitutional differentiation still obtains. Schechter Poultry Corporation v. United States, 295 U.S. 495, 546, 55 S.Ct. 837, 850, 79 L.Ed. 1570, 97 A.L.R. 947. 'Activities local in their immediacy do not become interstate and national because of distant repercussions.' Id., 295 U.S. 495, at page 554, 55 S.Ct. 837, 853, 79 L.Ed. 1570, 97 A.L.R. 947.

"To express this essential distinction, 'direct' has been contrasted with 'indirect,' and what is 'remote' or 'distant' with what is 'close and substantial.' Whatever terminology is used, the criterion is necessarily one of degree and must be so defined. This does not satisfy those who seek for mathematical or rigid formulas. But such formulas are not provided by the great concepts of the Constitution such as 'inter-

state commerce,' 'due process,' 'equal protection.' In maintaining the balance of the constitutional grants and limitations, it is inevitable that we should define their applications in the gradual process of inclusion and exclusion."

The Tenth Circuit Court of Appeals in Jewel Tea Co. v. Williams, 118 F.2d 202, 207, in dealing with a civil action under the Fair Labor Standards Act of 1938, said:

"Where goods are ordered and shipped in interstate commerce to meet the anticipated demands of customers without a specific order therefor from the customer and the goods come to rest in a warehouse, the interstate commerce ceases when the goods come to rest in the state. It does not continue until the demand eventuates in the form of an order and the merchandise is delivered to the retailer.

"The mere fact that an anticipated local transaction causes a movement in interstate commerce is not sufficient to constitute the local transaction a part of interstate commerce."

It will be observed, in examining the Fair Labor Standards Act of 1938, that the words "affecting commerce" are not used and in Fleming v. Arsenal Bldg. Corporation, D. C.S.D.N.Y., 38 F.Supp. 207, 211, Judge Woolsey called attention to this fact and said: "The Fair Labor Standards Act does not, however, as does the National Labor Relations Act, extend the limit of the federal jurisdiction to any act 'affecting commerce.'"

The constitutionality of the Fair Labor Standards Act of 1938 is not involved. It certainly was not the intention of Congress to legislate beyond its powers, and to presume that Congress intended to enact a law to regulate commerce other than interstate commerce would be a presumption unfair to Congress. The natural presumption is that Congress acted within its powers and its power to regulate commerce is limited to commerce between the states and with foreign nations. Right and power to regulate commerce wholly within a state were reserved to the state.

The Supreme Court, in the decisions hereinbefore referred to, specifically held that acts of commerce should not be so construed as to make that which is solely intrastate commerce, interstate commerce.

If the defendant slaughtered animals and sold the edible portion thereof both within the state and without the state, and it was clearly its intention that the edible portion of the animals would be sold in interstate commerce, there could be little question as to the applicability of the Act. However, when the removal of the hides and the offal is merely an incident in the business in which this defendant is engaged and the hides and the offal constitute a very, very small percentage of the value of the animals slaughtered, it would seem that the plaintiff is attempting to "push" the construction of the Act to apply to an incidental part of the business rather than the business itself.

The defendant did not remove the inedible portion from the edible portion for the purpose of placing the inedible portion in interstate commerce, but it removed the inedible from the edible portion as an incident in preparing the edible portion for the market and while the inedible portion was capable of being transported in interstate commerce, there was no intent on the part of the defendant that it should be so transferred. The edible portion also was capable of being transported in interstate commerce and there is little or no distinction in the manner in which the defendant disposed of the edible portion and the inedible portion. Both were disposed of in intrastate commerce to local purchasers and neither the hides nor the offal started to move in interstate commerce until after the hides had been seasoned and conditioned and then placed with other hides for shipment outside the state, and the offal actually was processed in an entirely different establishment by its purchaser before it was in condition to move in interstate commerce. So the inedible portion, as sold by the defendant, was not in condition for movement in interstate commerce at the time it left its dock.

It is admitted by the defendant that when the hides were sold at its place of business, the probabilities were that they would be sold to some tannery or shipped to some tannery outside the state, and it also inferred that the offal, which was reduced to grease, might be sold to some soap manufacturer outside the state. But it clearly had nothing to do with any interstate commerce feature. No act of any employee was an act in interstate commerce.

The only theory under which the Act could be made applicable would be the extent of its application to "the production of goods for commerce." The most that could be said is that the defendant separated the inedible portion from the edible portion

874

of the animals, which was an act of "servicing" rather than "producing."

The court, therefore, is of the opinion that the defendant and its employees, under the facts in this case, were not engaged in commerce as the term has been defined in this Act, and that, therefore, the Act is not applicable, and the prayer for injunction is denied.

Findings of fact, conclusions of law, and a form of judgment consistent with this opinion may be prepared. Exception is allowed the plaintiff.